**Gayle CAPSTICK, Plaintiff–Appellee,**

v.

**ALLSTATE INSURANCE COMPANY,
Defendant–Appellant.**

No. 91–7088.

United States Court of Appeals,
Tenth Circuit.

July 7, 1993.

---

Stephen R. McAllister (Larry L. Simms with him, on the Briefs), Gibson, Dunn & Crutcher, Washington, DC, for appellant Allstate Ins. Co.

Richard D. Gibbon, Richard D. Gibbon & Associates, Tulsa, OK (Aaron C. Peterson, Law Offices of Aaron C. Peterson, with him on the Brief), for appellee Gayle Capstick.

Before LOGAN and SEYMOUR, Circuit Judges, and BROWN, Senior District Judge.*

WESLEY E. BROWN, Senior District Judge.

The Plaintiff–Appellee Gayle Capstick filed this case against his automobile insurer, Defendant–Appellant Allstate Insurance Company, for damages for breach of contract, and bad faith refusal to pay an insurance claim after his auto was totally destroyed in a fire on January 11, 1990. By letter dated February 16, 1990, Allstate refused to pay the claim, telling Capstick that the "fire appears to be of incendiary origin for which you are responsible."

A jury awarded Capstick compensatory damages of $1,500 on his contract claim, and $3,000 consequential damages and $2 million in punitive damages on the bad faith claim. The district court denied Allstate's post-trial motions for relief from the judgment and amended the judgment to allow prejudgment interest.

Capstick has moved to dismiss this appeal for lack of jurisdiction because defendant Allstate failed to file its notice of appeal within thirty days of the entry of the original judgment in this matter dated February 8, 1991.

The record discloses that separate judgments on the jury verdicts were filed on February 8 without any reference to prejudgment interest. On February 19, Allstate filed its substantive post-trial motions and sought a stay of judgment and approval of a supersedeas bond. On February 20, Capstick filed an application under Fed.R.Civ.P. 59 claiming a right to such interest. Since an award of prejudgment interest was mandatory under state law, Allstate did not oppose that aspect of Capstick's post-trial motion. On March 26, a stay was granted; but the district court denied all of Allstate's post-trial motions. On May 9, Capstick filed a "Motion to Require Surety to Satisfy Judgment," claiming that the judgment should be satisfied because Allstate had not filed a notice of appeal within thirty days after its post-trial motions had been denied. On June 11, the district court entered an order granting prejudgment interest, but denying the motion to require surety since the motion for interest delayed the time for filing a notice of appeal.[1]

The district court correctly construed the motion for prejudgment interest as a Rule 59(e)[2] motion to amend the judgment, a motion which postponed the com-

* Hon. Wesley E. Brown, Senior District Judge, District of Kansas, sitting by designation.

1. The amended judgment included an award of $675.00 in prejudgment interest, and attorney fees of $94,500.

2. Rule 59(e) provides that a motion to alter or amend a judgment must be served not more than 10 days after entry of the judgment. Rule 60 provides for relief from judgments because of clerical mistakes, etc.

mencement of the time for filing a notice of appeal.[3] *Osterneck v. Ernst & Whinney,* 489 U.S. 169, 109 S.Ct. 987, 103 L.Ed.2d 146 (1989). Citing *Osterneck,* this circuit has ruled that "(t)he award of prejudgment interest, whether discretionary or mandatory, by a federal court, is an act which serves to remedy the injury giving rise to the underlying action and in that sense is part of the merits of the court's decision." The motion should be brought under Rule 59(e), and not Rule 60(a), since a Rule 60 motion "may not be used to alter the rate of prejudgment interest because that would call into question the substantive correctness of the judgment rather than remedy a clerical error or omission." *McNickle v. Bankers Life and Cas. Co.,* 888 F.2d 678 at 682 (10th Cir.1989). See also *Adams–Arapahoe School D. 28–J v. Continental Ins.,* 891 F.2d 772, 780 (10th Cir.1989).

Because the notice of appeal was timely, Capstick's motion to dismiss this appeal will be denied. Allstate's motion for sanctions in connection with the motion to dismiss will be denied.[4]

We now turn to the merits of the appeal. Allstate claims that under Oklahoma law, the district court erred in denying its motions for partial summary judgment and for directed verdict and for judgment not withstanding the verdict/remittitur, or for new trial, on the issues of bad faith and punitive damages.[5]

Allstate also contends that the court erred as a matter of law in permitting the jury to impose punitive damages in excess of the actual damages awarded, that the punitive damages awarded are excessive and unsupported by the evidence, and that the punitive damage award in this case was imposed in violation of federal constitutional due process.

Following our review of the record and the law, we find that the judgment should be affirmed.

The conflicting evidence which was presented by the parties presented a classic case for jury determination. Viewing the evidence in the light most favorable to the plaintiff, it appears that the jury could find that Capstick was a sixty-eight-year-old retired dean of a junior college in Pensacola, Florida, with a doctorate, who had held this position for twelve years before retiring. On January 11, 1990, he owned a 1982 Chevrolet Celebrity, purchased about two years before, which was insured by Allstate. Prior to this time, Capstick had been insured by Allstate for over 28 years, paying his premiums and making only a few claims for windshield and hail damage during all of those years. At the time of the fire, Capstick's vehicle was worth about $1,500; he did not owe any money on it or any other vehicle; there were no judgments against him; and he did not owe any debts to any one of any kind.

Capstick maintained his own car, and on January 11, 1990, he drove the Chevrolet to his son's home where it was more convenient to make repairs. The vehicle was parked next to a metal storage building, which contained a race car engine and other parts, valued at $20,000. Neither the building nor the contents were insured. Capstick and his son put the car upon ramps and began to remove the head in order to change the head gasket. They disconnected the air conditioner, loosened the intake manifold from the head and the exhaust manifold in front of the head, disconnected the water hose, loosened the bolts, removed the solenoid and disconnected the gas line. Capstick then got in the car and "bumped" the ignition in order to raise the pistons to the top so his son could inspect them. When the two decided to stop work for the day, they noticed gas flowing

3. Capstick's "Application to Assess Attorney's Fees, Interest and Costs and Amend Judgment Consistent With the Courts Assessment" was filed specifically "pursuant to the provisions of Rule 59, Federal Rules of Civil Procedure." Exhibit B, Appellant's Memorandum in Opposition to Motion to Dismiss.

4. In its discretion, this court may impose sanctions against parties and attorneys "who unreasonably increase the cost of litigation, through the inclusion of unnecessary material in records, briefs, appendices, addenda, and other pleadings, or in any other manner." Rule 46.6.1 Rules of the 10th Circuit Court of Appeals.

5. The trial court entered a minute order denying all of defendant's post trial motions. Applt. Appendix p. 62.

under the vehicle and, when Capstick tried to stop the gas flow, it spewed out of the gas line all over the engine and firewall of the vehicle. Capstick tried to disconnect the battery in order to prevent a fire; but a fire exploded in the engine compartment, and additional gas flowed out of the fuel line fueling the fire.

With chains and another car, Capstick and his son did succeed in dragging the Chevrolet away from the building and its uninsured contents, but by that time the interior of the car was burning, and the car was entirely consumed. Capstick had four quarts of transmission fluid and five quarts of oil in the back of the car and these added fuel for the fire. A grass fire was started under the building, but this fire was put out without any damage to the contents of the metal building. Capstick's neighbors helped plaintiff and his son put out the fire, and these neighbors were of course available to Allstate as witnesses to the occurrence.

Capstick reported the loss to Allstate the next day and, from the very beginning without any investigation, Allstate treated the claim as a "suspicious loss." The initial entry in plaintiff's claim file was made at 11:31 a.m. upon receipt of plaintiff's telephoned report:

> Insured vehicle burned up as he was doing repair work on the vehicle it is a total loss Pete ... Possible suspicious loss....

Allstate presented evidence that this was merely a clerical entry into its computer system because Capstick's policy number could not immediately be found, and it was mistakenly assumed that his was a "new" policy. By noon on that date, it had been determined that Capstick had active coverage and had been Allstate insured since 1972.

The jury was entitled to consider the significance of this entry in the light of other evidence tending to show that Allstate continued to pursue Capstick's claim on the assumption that it was a "suspicious loss." Both before and after his claim was rejected, Capstick requested that an Allstate agent come out to the scene of the fire, which he had preserved by covering the area with plastic. Instead of doing so, Allstate had the vehicle removed to a salvage yard in Sapulpa, Oklahoma. Allstate's adjuster, Peter D'Alessandro, who had previously handled six to ten fire loss claims for the company, visited the salvage yard and determined that the auto "looked burned up." He reported "I have only seen them this burned up when they were stolen and had gas poured all over them."

D'Alessandro called in Jack Yates to perform a "cause-and-origin" examination of the car. Yates asked if there was an explanation for a heavy petroleum product that would be in the front floor pan area of the vehicle, but he was told only that the car caught fire while Capstick was working on it; and Yates was never informed of Capstick's explanation that the vehicle burned when gasoline sprayed all over the engine firewall and below the vehicle. Yates verbally reported that he had smelled diesel fuel in the vehicle, and a lab analysis found a heavy petroleum product on the floor of the vehicle.[6] At this point, Capstick was called into the Allstate office and voluntarily gave an affidavit concerning the origin of the file. D'Alessandro filled out the affidavit, leaving out much of the detailed information which was furnished by Capstick at this time. Particularly, the agent failed to note that there were witnesses to the fire who would have confirmed Capstick's statement of the events. D'Alessandro and his supervisor both decided not even to interview plaintiff's son, who was present at the fire, because he would only "back up his father as to what had happened."

The jury heard evidence from Michael Bruun, a mechanic retained by Allstate to evaluate Capstick's description of events. While Bruun believed that a faulty computer and fuel pump relay were possible sources of the fire, D'Alessandro chose to record that while a "messed up fuel pump relay" could

6. Yates made a written report to Allstate noting that in his opinion the fire involved an "intentional addition of an accelerant" and was followed by ignition through an unidentified source. At trial, Yates admitted that he did not know how long the diesel fuel had been present in the car, and he was not told of Capstick's statement of the circumstances of the fire.

have caused the fire, "Everything is possible. But not likely." [7]

Capstick was again called in to give a deposition under oath before Mark Hanson, in-house counsel for Allstate. Capstick was required to bring in his tax returns for the past several years, his decree of divorce, copies of all other insurance policies covering the loss, including dwelling and contents insurance, copies of his monthly bank statements, canceled checks and financial records for 1985–1989; account books and statements for all of his business interests, copies of all promissory notes, leases, mortgages and liens on any real or personal property he owned, and "any and all other documentation of whatever kind or nature including any receipts which you have in your possession ... in order to buttress and verify the claim" which he filed. When Capstick came in with all of his documents, Allstate agents spent only two to three minutes looking them over, and none were kept by Allstate for review. While Allstate argued that there were material discrepancies between the sworn statement and Capstick's earlier account of the loss, the jury was entitled to find that these differences did not exist.

In the first instance, Allstate contends that it was entitled to summary judgment and/or directed verdict upon the bad faith claim because its denial of the claim was based upon a good faith arson defense which "demonstrated the existence of a legitimate dispute over coverage, precluding a finding of bad faith or an award of punitive damages under Oklahoma law." In support of this argument, Allstate cites *Manis v. Hartford Fire Ins. Co.*, 681 P.2d 760 (Okla.1984), and *Conti v. Republic Underwriters Ins. Co.*, 782 P.2d 1357 (Okla.1989). In *Manis* the court found that the insurer reasonably contested coverage because there was evidence that the fire was incendiary in origin; a state fire marshal testified that the fire was deliberately set, the plaintiff had operated his bar at a loss for four years, that he had increased his mortgage debt on the building after he purchased it, and that he had a questionable alibi at the time of the fire. In *Conti*, the court found that there was a legitimate dispute and that the insurer acted in good faith since there was physical evidence of arson, and plaintiff failed to pass three polygraph tests which he himself requested.

While Allstate contends that there was "undisputed scientific evidence" of arson present in this case and that it had legitimately disputed coverage, the trial court in overruling the motion for directed verdict specifically found, under the evidence described above, that the company had simply picked an "expert" who was not given any information concerning the true circumstances of the fire, and that Allstate had denied coverage without making any other bona fide investigation of plaintiff's claim. Appellee Appendix pp. 358–359. After the Capstick trial, the Supreme Court of Oklahoma in *McCoy v. Okla. Farm Bur. Mut. Ins. Co.*, 841 P.2d 568 (Okla.1992), determined on similar facts that a jury was entitled to evaluate a bad faith claim, when the legitimacy of the insurer's "good faith" claim was suspect.[8] After the *McCoy* decision, Allstate filed a motion to certify questions of law to the Oklahoma Supreme Court as to whether or not it was entitled to a judgment as a matter of law on the bad faith claim since, in its view, *McCoy* "potentially unsettles the applicable state law ..." In making its argument, Allstate erroneously contends that its arson evidence was based upon "undisputed scientific evidence," thereby overlooking all other evidence tending to prove that it failed entirely to conduct any legitimate investigation of plaintiff's claim. We find the *McCoy* case to be entirely clear on its face, and the motion to certify any issue to the state court will be denied.

Under the evidence discussed above, we find that the issue of bad faith was properly submitted to the jury. The instruction which

7. Bruun also testified that there were a couple of other possible ways that the fuel pump could continue to pump fuel without a key in the ignition, if there was a faulty oil pressure switch or "oil sending unit".

8. In *McCoy*, the jury did not believe that the homeowner, a former fireman, had deliberately set his home on fire, when the testimony from eyewitnesses was contrary to the testimony of the insurer's expert, and there was no other evidence that the fire was arson related.

was given on bad faith was appropriate under Oklahoma law and clearly set out for jury evaluation Allstate's position regarding the presence of a legitimate dispute over coverage. The jury was instructed that:

> The law provides that persons who contract with each other have an implied covenant or promise to deal with each other in good faith.
>
> One of those implied covenants in an insurance contract is that the insurer will not act in bad faith with an intent to wrongfully and unreasonably withhold payment of an insured's valid claim. The term "in bad faith with a wrongful intent" means "without good cause or without a legitimate business purpose."
>
> Upon receipt of a valid claim, an insurance company has an obligation and a duty to pay such claim immediately or promptly without any unreasonable delay. However, an insurance company has the right to make a reasonable investigation of claims and to withhold payment of claims when such an investigation shows that a claim is not valid.
>
> In that regard, the defendant Insurance Company does not breach its duty to deal in good faith with an insured such as plaintiff Capstick, if you find from all the evidence there is a legitimate dispute as to whether or not there is coverage under the insurance policy, and the defendant Insurance Company's acts and position are reasonable and legitimate." (Appellee Appendix pp. 105–106).

The jury's verdict on the bad faith claim is supported by the evidence and will not be disturbed.

Allstate next contends that other than some slight "mental anguish," Capstick failed to prove any consequential damages which resulted from the refusal to pay his claim, therefore he was not entitled to an award of punitive damages.

Under the law of Oklahoma, recovery of damages for mental suffering "does not require either 'severe' mental distress or 'outrageous' conduct to be actionable ..." *Timmons v. Royal Globe Ins. Co.*, 653 P.2d 907, 916 (Okl.1982).[9] But under the evidence in this case, the jury was entitled to find that Capstick, who cooperated fully with Allstate in the investigation of his claim, sustained considerable mental distress, inconvenience, annoyance, and expense while producing all of the information required to support his claim. He testified that the investigation "bore greatly" on his life, and he spent much time "thinking about how I could convince Allstate that I was not an arsonist," that "(e)very night I would go to sleep thinking about this situation, what could I do, and would run over in my mind, well, I could do this; I could do that. And it did put a turmoil in my life for this period of time." He was also concerned that Allstate was inquiring about his divorce, and worried that, at his age, denial of his claim would affect his insurability in the future. (Applt. Appendix pp. 178–179).

Under these circumstances, it is clear that Capstick did sustain consequential damages as a result of Allstate's tortious conduct.

Under Oklahoma law, Capstick was entitled to recover punitive damages in addition to consequential damages. *Timmons v. Royal Globe Ins. Co., supra,* 653 P.2d 907; *Spaeth v. Union Oil Co. of California,* 762 F.2d 865 (10th Cir.1985), *cert. den.* 476 U.S. 1104, 106 S.Ct. 1946, 90 L.Ed.2d 356 and he was entitled to an award in excess of his actual damages if the trial court determined that there was evidence that defendant acted with wanton or reckless disregard of plaintiff's rights.

The Oklahoma punitive damage statute, effective November 1, 1986, limits the amount of punitive damages to the amount of actual damages, in the absence of certain evidence which would raise the cap on damages. Thus Section 9, Okla.Stat.Tit. 23 (1986), as amended, provides that:

> A. In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of conduct evincing a wanton or reckless disregard for the rights of another, oppression, fraud or

9. In *Timmons,* the jury awarded an insured $25,000 for mental suffering and embarrassment caused by the insurer's failure to act in good faith.

malice, actual or presumed, the jury, in addition to the actual damages, may give damages for the sake of example, and by way of punishing the defendant, in an amount not exceeding the amount of actual damages awarded. *Provided, however, if at the conclusion of the evidence and prior to the submission of the case to the jury, the court shall find, on the record and out of the presence of the jury, that there is clear and convincing evidence that the defendant is guilty of conduct evincing a wanton or reckless disregard for the rights of another, oppression, fraud or malice, actual or presumed, then the jury may give damages for the sake of example, and by way of punishing the defendant, and the percentage limitation on such damages set forth in this section shall not apply.* (Emphasis supplied)

In a case of first impression, this circuit reviewed the amended statute in *Marshall v. El Paso Natural Gas,* 874 F.2d 1373 (10th Cir.1989), where the trial judge made a finding that there was clear and convincing evidence of the prohibited conduct and submitted the case to the jury without requiring the jury to make a finding of "clear and convincing evidence" prior to its award of punitive damages. Prior to the amendment, punitive damages were submitted to the jury upon a "preponderance of the evidence" standard; and the *Marshall* panel, in applying the amended statute, found that the state legislature did not modify the burden of proof from a preponderance of the evidence to "clear and convincing evidence." In this respect, the panel construed the amendment in this manner:

> The amended statute also added a new second sentence requiring the court to make a finding, before the case is submitted to the jury, whether there is clear and convincing evidence to allow an award of punitive damages in excess of the actual damages awarded. Our reading of this change does not support the conclusion that the issue of "enhanced" punitive damages may only be submitted to the jury under the standard of clear and convincing evidence.
>
> *    *    *    *    *    *
>
> A plain reading of the statute creates a threshold test for the plaintiff to meet in order for the issue of punitive damages to be submitted to the jury without limitation to the amount of actual damages. Once the threshold is met, the punitive damages issue is submitted to the jury under the standard of preponderance of the evidence to determine the amount of punitive damages regardless of whether it equals or exceeds the actual damages awarded. (874 F.2d at 1383–1384) [10]

In the instant case, the trial court made the required finding under Title 23, Section 9:

> I find that there is clear and convincing evidence that the defendant is guilty of conduct evidencing a wanton or reckless disregard for the rights of the plaintiff, oppression, malice could be actual or presumed, and I'm going to leave it open for the jury to determine the punitive damages. (Appellee Appendix, p. 357)

The issue of whether there was sufficient evidence to support such a finding is a question of law, and, on review, the question is whether the plaintiff "presented evidence sufficient that a reasonable person might conclude the (defendant) acted in a punitive manner." We find such conclusion to be supported by the record. *Marshall v. El Paso Natural Gas Co., supra,* at p. 1384. The trial court did not err in presenting the issue of punitive damages to the jury, under appropriate instructions, without restriction of the amount to the sum of actual damages.[11]

10. In the *Marshall* case, which involved defendant's acts in drilling and plugging a well on plaintiffs' property, the jury returned a verdict for $350,050 for diminution in value, $50,000 for nuisance damages and punitive damages of $5 million. This verdict was affirmed.

11. The instruction given on punitive damages was as follows:

> If, and only if, you find that the plaintiff Capstick is entitled to recover actual damages against the defendant Insurance Company on his breach of implied covenant of good faith and fair dealing cause of action, and if you further find from the evidence that the conduct of the defendant amounted to oppression, gross negligence, malice, or reckless and wan-

Allstate next contends that Oklahoma law, "which permits juries to impose punitive damages without meaningful guidance" violates Fourteenth Amendment due process under the standards recently set forth by the Supreme Court in *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), and that the amount of the award is excessive. These issues present questions of federal law.

In the *Haslip* case the jury, finding under Alabama law that an insurance agent fraudulently failed to remit health insurance premiums to his company, returned a verdict awarding plaintiffs approximately $200,000 in compensatory damages, $4,000 in out-of-pocket expenses, and $840,000 in punitive damages. The Supreme Court found Alabama's procedures for assessing and reviewing the award of punitive damages imposed sufficient restraints on the jury's discretion in terms of constitutional due process and further found that, under the circumstances of the case, the amount of the punitive damage award was reasonable.

Here, the district court was required to instruct the jury under the substantive Oklahoma law which governs punitive damage awards. As noted, the Oklahoma legislature has addressed the problem of punitive awards and has by statute set a "cap" on awards, to be removed only upon a specific finding by the trial court that there is "clear and convincing evidence that the defendant is guilty of conduct evincing a wanton or reckless disregard for the rights of another, oppression, fraud or malice, actual or presumed." In this instance, the district court made such a finding, and that finding of fact and law is supported by the evidence.

The district court thereafter instructed the jury according to the provisions of Title 23, Section 9, Okla.Stat., that it might give damages "for the sake of example, and by way of punishing the defendant," "if, and only if" it found that Capstick was entitled to recover actual damages on account of Allstate's bad faith. The jury was also instructed that the jury must further find that the conduct of the defendant "amounted to oppression, gross negligence, malice, or reckless and wanton disregard of plaintiff's rights." The jury was additionally told that these terms meant "such willful acts or conduct that would cause harm or injury to another, committed either intentionally or by indifference to, or conscious disregard of, the rights of others."

In all respects the Capstick jury was given specific guidelines to follow in determining whether or not punitive damages were appropriate in the circumstances of this case. It was not allowed to "run wild," and its discretion to impose punitive damages was confined to deterrence and retribution, the specific policies to be advanced under the state statute. The procedures followed by the trial court in removing the punitive damage cap are identical to that approved by this circuit in *Marshall v. El Paso Natural Gas Co., supra,* 874 F.2d 1373, and in full accord with the guidelines provided by the Supreme Court in *Haslip, supra.* See *Glasscock v. Armstrong Cork Co.,* 946 F.2d 1085 (5th Cir. 1991), *cert. den.* — U.S. —, 112 S.Ct. 1778, 118 L.Ed.2d 435; and *Eichenseer v. Reserve Life Ins. Co.,* 934 F.2d 1377 (5th Cir.1991).[12] In *Harrell v. Old American Ins. Co.,* 829 P.2d 75 (Okl.App.1991), a medical insurer failed to seek medical advice on a claim, failed to consult counsel about relevant law, and failed to ask the insured about

ton disregard of plaintiff's rights, then, in addition to the actual damages to which you find the plaintiff entitled, you may award the plaintiff an additional amount, not as compensation, but as exemplary or punitive damages, in such sum as you believe will serve to punish the defendant and for the sake of example to deter others from like conduct.

The terms "oppression, gross negligence, malice, or reckless and wanton disregard of the plaintiff rights" means such willful acts or conduct that would cause harm or injury to another, committed either intentionally or by indifference to, or conscious disregard of, the rights of others. (Appellee Appendix at pp. 107–108)

12. In *Glasscock,* an asbestos case, the jury awarded 18 plaintiffs total compensatory damages of $2,590,500 against all defendants, $317,625 of which was attributable to the fault of defendant Celotex. The jury also awarded 11 plaintiffs a total of $6,100,000 in punitive damages against Celotex. After reviewing the award under *Haslip* standards, the court affirmed the punitive award. The *Eichenseer* case is discussed, *infra.*

additional facts pertaining to her hospitalization. In affirming an award of $1,800 compensatory damages on a breach of contract claim, $40,000 on a bad faith claim, and $250,000 in punitive damages, the court found the insurer had shown a wanton or reckless disregard for the rights of its insured, and that the trial court had properly removed the restriction on the amount of punitive damages which the jury could award. 829 P.2d at 79.

In post-trial motions, Allstate alleged that the amount of the punitive award was unsupported by evidence and was excessive, and sought a remittitur or new trial. These motions were denied by the trial court. In the federal court system, the trial judge has broad discretion in deciding whether to grant a new trial, and the court's ruling on such a motion will not be disturbed on appeal unless there is "a gross abuse of discretion." *Whiteley v. OKC Corp.*, 719 F.2d 1051, 1058 (10th Cir.1983). The court there described the scope of review in this manner:

> "When reviewing the district court's use of its discretion regarding excessive verdict claims, we must determine whether the award was "so excessive ... as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial...." Although we can reverse the verdict if it is too far out of line, there must be a strong showing of an abuse of discretion....
>
> Under Oklahoma law, each case with an excessive verdict issue must be reviewed upon its own facts and circumstances ... In (*Hitchcock v. Weddle*, 304 F.2d 735 (10th Cir.1962)), ... we noted that this Circuit and Oklahoma courts have held that the jury's verdict need be supported only by any evidence tending to sustain it ... As the reviewing court, we must view the evidence in the light most favorable to the prevailing party....
>
> In reviewing the record on appeal, we observe that the determination of damages is traditionally a jury function ... This is so because the jury has heard the evidence first hand and has observed the demeanor of the witnesses. The jury must have much discretion to fix the damages deemed proper to fairly compensate the plaintiff...." (Citations omitted). (719 F.2d at 1058)

In August, 1990, a panel of this court rendered a decision in *The Post Office v. Portec, Inc.*, 913 F.2d 802 (10th Cir.1990), *cert. granted, vacated and remanded,* 499 U.S. ——, 111 S.Ct. 1299, 113 L.Ed.2d 235, for reconsideration in light of *Pacific Mutual Life Ins. Co. v. Haslip, supra,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1. In *The Post Office* case, a trademark owner alleged infringement, violation of the Lanham Act, fraud, and other violations of the state law. The jury returned verdicts in favor of plaintiff for damages of $79,519.40 on the misappropriation of trade secrets and breach of fiduciary duty claims, plus $1,500,000 in punitive damages. While the jury returned a verdict in favor of plaintiff on fraud claims, it awarded zero damages on those claims. This court found that the instructions and answers to interrogatories provided a basis for the punitive damage award even though there was no specific finding of willful or intentional conduct on certain of the claims, and concluded that the Colorado punitive damage statute did not violate the due process clause under the Federal or State Constitution.[13] The court noted that the determination of whether a jury award of punitive damages was excessive was a matter of federal law, even though the justification for punitive damages was a matter of state law and determined that the punitive damage award was excessive, ordering a remittitur to $500,000 in punitive damages. In so doing, the panel applied the following standards for reviewing claims of excessive verdicts:

13. The damages were awarded under Colorado's old punitive damages statute, Colo.Rev.Stat. § 13–21–102 (1973). A later Colorado statute limited punitive damage awards to an amount equal to the actual damages. 913 F.2d at 809, fn. 2.

The 10th Circuit had previously upheld the Colorado statute under a due process challenge in *Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 703 F.2d 1152, 1172–73, *cert. den.* 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 and that opinion was found to be controlling in the case.

> In this circuit, remittitur of a jury verdict awarding punitive damages is allowed only when "an award (is) so excessive as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption, or other improper cause invaded the trial ..." In (*Malandris v. Merrill Lynch, et al.* at 703 F.2d 1177) we announced the factors to be considered in determining whether an award of punitive damages is excessive.
>
> The proper factors to be considered include: (a) the nature of the act which caused the injury; (2) the economic status of the defendant; and (3) the deterrent effect of the award on others. In addition, Colorado requires that the punitive damages bear some relation to the compensatory award. *The Post Office,* 913 F.2d at pp. 809, 810.

In concluding that a remittitur should be ordered, the panel noted that while the acts were found to be willful and intentional, they did not involve violence or outrageous conduct and that, since defendant's net worth was only $6,942,000, the award of $1,500,000 amounted to 21.6% of that worth and was in excess of the $795,194 in gross sales realized by defendant from its wrongdoing. Under Colorado law, the ratio of punitive damages to actual damages is a factor, but the panel considered the 19:1 ratio of punitive to actual damages "as only one factor" in its analysis. The panel also found it significant that the trial court had entered a broad injunction preventing the manufacture or sale of defendant's product for a period of four years. In lowering the award, the panel found that "the defendant's net worth of only $6,942,000.00 and its total gross sales of $795,194.00 for this product to be dominant factors." 913 F.2d at 811.

After remand by the Supreme Court, the opinion of August, 1990 was vacated and, by stipulation of the parties, the appeal was dismissed with prejudice. *The Post Office v. Portec, Inc.,* 935 F.2d 1105 (10th Cir.1991).

Following the *Haslip* and *The Post Office* decisions, a panel of this court determined that a punitive damage award of $25 million was excessive in a personal injury/wrongful death action brought under Kansas law. *Mason v. Texaco, Inc.,* 948 F.2d 1546 (10th Cir.1991), *cert. den.* — U.S. —, 112 S.Ct. 1941, 118 L.Ed.2d 547. The case involved a benzene-related leukemia death, in which a verdict was returned for $9,025,000 in actual damage and $25 million in punitive damage. In a pre-*Haslip* review of the evidence, the trial court found that the punitive award was not excessive since the jury could infer that the defendant's failure to warn of danger was designed to conceal the danger; the award exceeded actual damages by less than 3 to 1; and the award represented only 0.31% of defendant's net worth and 1.92% of its annual net earnings. *Mason v. Texaco, Inc.,* 741 F.Supp. 1472 (D.C.Kan.1990). On the appeal, this circuit agreed that an award of punitive damages was justified, and that the award was not motivated by passion, prejudice or bias, but found the "staggering sum" of $25 million in punitive damage to be "so excessive as to shock our judicial conscience," and "excessive and beyond a reasonable punitive award under the law of Kansas." [14] 948 F.2d at 1560, 1561. In this case, it was significant to the panel that in the first trial of the action, which was "substantially similar" to the second trial, the plaintiff sought punitive damages of only $8,000,000, and the first jury did not award any punitive damages.

In *Broadcort Capital Corp. v. Summa Medical Corp.,* 972 F.2d 1183 (10th Cir.1992), which involved the conversion of a stock certificate, the jury returned a verdict under New Mexico law of $1,600,000 in compensatory damages and $400,000 in punitive damages. On appeal the defendant claimed that the punitive damage award was excessive because the jury instructions did not contain adequate safeguards; but the verdict was upheld under *Haslip* with a note that the award was only one-quarter of the amount of compensatory damages and that "the jury

14. Under Kansas law, the following factors are relevant in reviewing an award of punitive damages: the actual damages sustained, the actual damage award, the circumstances of the wrong, the intent of the party, the relative positions of the plaintiff and defendant, the defendant's financial worth, and the plaintiff's probable litigation expenses. 948 F.2d at 1560.

instructions satisfied (the defendant's) interest in rational decision making and ensured that the jury's discretion would be exercised within reasonable constraints."[15] Under these circumstances, this circuit found "that this award does not 'jar one's constitutional sensibilities' and was not entered in violation of due process principles." 972 F.2d at 1193, 1194.

In determining whether or not the trial judge abused his discretion by failing to order a remittitur or to grant a new trial in this case, under *Haslip,* we must determine whether or not the amount of punitive damages awarded to Capstick is "excessive"—whether there was an extreme result which would "jar one's constitutional sensibilities," or whether the damages "are reasonable in light of their amount and rational in light of their purpose to punish what has occurred and to deter its repetition." *Haslip, supra,* 499 U.S. at pp. ——, ——, 111 S.Ct. at pp. 1043, 1045, 113 L.Ed.2d at pp. 20, 22.

In *Haslip,* the Supreme Court recognized that it could not "draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." 499 U.S. at ——, 111 S.Ct. at 1043, 113 L.Ed.2d at 20, and thus our review of such issues must be upon a case-to-case basis.

Under Oklahoma law, punitive damages need not bear a specific relation to the actual damages awarded, but they must have some relation to the injuries inflicted. *Garland Coal & Mining Co. v. Few,* 267 F.2d 785, 791 (10th Cir.1959).

Under the evidence here, the jury could find that Allstate's conduct was particularly egregious and wrongheaded, clearly oppressive and "evidencing a wanton or reckless disregard" for Capstick, its insured. It is significant that Allstate specifically and repeatedly labelled Capstick as an arsonist and one who intended to pursue an insurance fraud. These are significant factors which support the punitive award in this case.

The ratio of actual damages to punitive damages is only one factor in determining the question of excessive punitive damages. See *Bradbury v. Phillips Petroleum Co.,* 815 F.2d 1356, 1366 (10th Cir.1987); *Malandris v. Merrill Lynch, Pierce, Fenner & Smith, supra,* 703 F.2d 1152 (10th Cir.1981).

In many cases involving bad faith conduct by insurance companies or others, the actual amount in controversy may be relatively insignificant, as was Capstick's contract claim for $1,500, the consequential damages may be only nominal, but the outrage may be significant. Under Oklahoma law, the net worth of a defendant may be considered in assessing punitive damages. In the recent Oklahoma case of *Harrell v. Old American Ins. Co., supra,* 829 P.2d 75, the insurer denied plaintiff's hospitalization claim without any legitimate investigation of her medical status and without any attempt to communicate with the her doctors.[16] The jury returned a verdict of $1,800 in compensatory damages on the breach of contract claim, $40,000 on the bad faith claim,[17] and awarded plaintiff $250,000 in punitive damages. The Oklahoma court approved the pu-

15. The jury instruction mentioned stated:

> In the event you find that Broadcort should recover either actual or nominal damages, and if you find that Broadcort has proven by a preponderance of the evidence that the acts of Summa were willful, wanton, or malicious then you may award exemplary or punitive damages. (972 F.2d fn. 14 at 1193)

16. When the insured asked the company to reconsider the rejection of the claim, explaining that she was "in desperate need of this money", a second rejection letter was simply sent without any investigation whatsoever. The court noted that:

> It is significant on the issue of bad faith that prior to mailing the letter the record does not disclose that the examiner asked either the company doctor about the medical significance of the sudden sickness that set in on the third postoperative day, or the company counsel about the relevant law, or (the insured) about additional facts pertaining to her postoperative complications. (829 P.2d at 77)

17. Sufficient basis for the $40,000 award on the bad faith claim was found in evidence that the insured suffered mental anguish, distress, embarrassment, harassment by creditors, and anxiety and worry as a result of the insurer's failure to deal fairly.

nitive award, noting that it was not excessive in view of stipulated evidence that the insurer had net assets of $32,420,182.[18]

The case of *Eichenseer v. Reserve Life Ins. Co., supra,* 934 F.2d 1377, involved a health insurance claim for $6,658.35 which was not paid by defendant until there was pretrial discovery in the case more than three years after the first demand for payment. The insurer Reserve Life Insurance Company denied coverage without any medical records to support that decision and continued to deny coverage even after several copies of plaintiff's medical records and an affidavit from her doctor had been submitted to the company. After a bench trial, and application of Mississippi law, the district court awarded plaintiff $1,000 in compensatory damages and $500,000 in punitive damages. On petition for certiorari, the Supreme Court vacated that decision and remanded the case for reconsideration in light of the *Haslip* opinion. Following such review, the court noted that under *Haslip* the test now must be whether or not the award is reasonable under the circumstances of each case:

> "Under *Haslip* an award of punitive damages does not meet constitutional requirements unless the circumstances of the case indicate that the award is reasonable. This condition ... is not a vehicle for expansive appellate review of punitive damages awards. It creates, instead, a narrow channel for appellate review in which the focus of a reviewing court is to ensure that, *under the circumstances of the case in question,* the award of punitive damages is not grossly excessive or unreasonable." 934 F.2d at 1382 (emphasis of the court).

After reconsideration, the *Eichenseer* court found that the $500,000 punitive award did not violate the due process clause because the procedures used in assessing the damages were constitutionally sufficient, and the insurer's conduct in the case "was particularly egregious" ... (since it) "acted with reckless disregard—if not intentional disregard—for the rights of its insured," and that such conduct was a "significant factor" which supported the $500,000 award.

In addition, the 5th Circuit found that the corporate size of Reserve Life which had a net worth of $157,000,000 was another circumstance that indicated that the award was suitable:

> The district court reasoned, in part on the basis of this net worth, that a $500,000 punitive damages award was necessary to deter the insurer from future misconduct.... A $500,000 award ... would "get the attention of Reserve Life." The court's consideration of the deterrent effect of its award was proper. One of the fundamental purposes of punitive damages is to deter a wrongdoer from future misconduct. While the Due Process Clause requires that punitive damages not be grossly excessive, it does not require that punitive damages be ineffectual and impotent. 934 F.2d at 1383–1384.

In *Spaeth v. Union Oil Co. of California, supra,* 762 F.2d 865 (10th Cir.1985) this cir-

18. The review of damages in *Harrell* was made under *Haslip* standards, and a finding was made that the punitive award did not violate defendant's duc process rights under the Fourteenth Amendment.

In *Timmons v. Royal Globe Ins. Co., supra,* 653 P.2d 907, suit was brought against an insurer for breach of the duty to deal fairly and to act in good faith in connection with its wrongful refusal to assume coverage under plaintiff's aviation policy or to defend him against the claims of passengers who were injured in a plane crash in which he was the pilot.

The jury returned a verdict for plaintiff for $9,126 in actual damages, $25,000 for mental pain and suffering, and $3 million in punitive damages. The Oklahoma Supreme Court ruled "*that the cause of the injuries and the harm done* to society by that genre of conduct are very material in determination of a punitive damage award," and that, "(m)easured by the wealth of the defendant, the amount awarded cannot be said to be legally erroneous considering the economic resources of the defendant and the premise that a punitive damage verdict is peculiarly within the province of the jury and will not be casually interfered with on the grounds of passion or prejudice," 653 P.2d at 919. The court further found, however, that an undue element of sympathy had influenced the jury, so the punitive award was reduced to $1.5 million.

cuit found that the trial court, in a case under Oklahoma law, did not abuse its discretion in awarding $2 million in punitive damages against an oil company which had a net worth of approximately $3⅓ billion dollars, where the company had maliciously allowed drainage of plaintiff's gas and opposed her attempts to obtain relief.[19]

The Capstick jury was instructed that the parties had stipulated that the net worth of Allstate Insurance Company as of December 31, 1989, was in the sum of $4,524,478,-599.00—that is—over $4.5 billion dollars. As in the *Eichenseer. Spaeth* and *Harrell* cases, this is a significant factor which justifies the amount of the verdict in this case, since under Oklahoma law the purpose of a punitive award is to punish and deter a wrongdoer. In order to have a deterrent effect, the damage award must be sufficient to attract the attention of the defendant in order to assure that oppressive practices do not continue.

A further factor which we consider significant in finding that the amount of the punitive award was reasonable in this case is the evidence that several Allstate representatives who testified at trial believed that their handling of Capstick's claim was consistent with the company's directions and policies, that no suggestion of error had ever been sent to them by the company, and that they would continue to handle claims in the same manner in the future. The highest ranking company representative in the courtroom, John Nicholson, testified that the claim was handled correctly and that all future claims would be handled in a similar way.[20] With this type of evidence, it is fair and reasonable to believe that anything short of the award given here would fail to have any desired deterrent effect upon defendant's future conduct in handling the claims of Oklahoma policyholders.

On this record, we conclude that the jury was properly and adequately instructed on the issue of punitive damages under Oklahoma law, that it was not swayed by passion or prejudice, and that the amount of the punitive damage award was reasonable, in light of the evidence in this case which established the oppressive nature of the defendant's conduct and the necessity that such damages be assessed for the sake of example and by way of punishing the defendant.

In accordance with the foregoing, appellee's motion to dismiss the appeal is DENIED; appellee's motion for sanctions is DENIED; appellant's motion to certify this case to the Supreme Court of Oklahoma is DENIED; and the judgment is AFFIRMED.

**19.** In *Spaeth,* a jury had awarded $3 million in punitive damages, and actual damages of $22,-807. In a first appeal, the Circuit panel found that that $3 million award "shocks our collective judicial conscience" and remanded the case "to order a remittitur of a substantial amount in punitive damages with due consideration to the amount needed to punish the defendant in the particular circumstances permitted." As noted, in the second appeal, the panel found that the $2 million figure was justified and necessary to punish the defendant for "egregious conduct." 762 F.2d at 867.

**20.** Mr. Nicholson testified that "overall, I'm satisfied with the way the claim was handled," and with the manner in which it was investigated.