**UNITED TECHNOLOGIES CORP., et al.**

v.

**AMERICAN HOME ASSURANCE COMPANY.**

No. 2:92cv267 (JBA).

United States District Court, D. Connecticut.

June 5, 2000.

David B. Zabel, Stewart I. Edelstein, Marci J. Silverman, Stuart M. Katz, Cohen & Wolf, P.C., Bridgeport, CT, Kay M. Brady, Stephen M. Goldman, Carolyn M. Branthoover, Thomas J. Smith, Robert Bruce Allensworth, David F. McGonigle, Keith A. Fabi, Michael G. Zanic, Evan A. Bloch, David T. Fisfis, Diane B. Hopper, Terry Budd, C. Michele Kirk, Peter J. Kalis, David R. Cohen, Mary Beth Collery, Thomas M. Reiter, John P. Englert, Michael S. Nelson, Alan W. Tamarelli, Richard W. Hosking, Eric S. Lammers, Heath B. Monesmith, Joseph C. Safar, Jeanne M. Sauer, David P. Anderson, Douglas J. Simmons, Kirkpatrick & Lockhart, Pittsburgh, PA, Patrick J. McElhinny, Amy O. Goodman, Brian F. Saulnier, Joseph R. Gette, Erica D. Merkow, Douglas A. Pearson, Angelica R. Hopwood, Kristen M. Del Sole, Julie V. Stanier, Richard D. Dworek, Matthew R. Swenson, James E. Hannon, Jr., Paul K. Stockman, Joseph L. Luciana, III, Kirkpatrick & Lockhart, Pittsburgh, PA, for United Technologies Corp., Carrier Corp., United Tech Automotive, Inc, plaintiffs.

Robert W. Allen, Noble Francis Allen, Timothy P. Jensen, Tyler, Cooper & Alcorn, New Haven, CT, David A. Silva, Bruce R. Kaliner, Wayne R. Glaubinger, Stuart Cotton, Daniel Markewich, John Mezzacappa, Mitchell S. Cohen, Diana E. Goldberg, Sarah D. Strum, Aaron F. Fishbein, Hilary M. Henkind, Mark J. Weber, William D. Wilson, Todd A. Bakal, Elisa T. Gilbert, Michael T. Altman, Mound, Cotton & Wollan, New York City, Roger E. Warin, William T. Hassler, Libretta A. Porta, Thomas M. Contois, Mark C. Elmer, John L. Jacobus, Ripple L. Weistling, Ellen Hochstedler Steury, John A. Flyger, Edward J. Twomey, Andrew J. Sloniewsky, Stephen A. Fennell, Errol R. Patterson, Heather Doherty Clark, Steptoe & Johnson, Washington, DC, Henry T. Vogt, Simsbury, Jeffrey R. Lerman, Leonard A. Busby, Howard J. Bashman, Cynthia B. MacQueen, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, for American Home Assur. Co., defendant.

### *RULING ON PLAINTIFF'S RENEWED AND SUPPLEMENTAL MOTION FOR PUNITIVE DAMAGES [DOC. # 995]*

ARTERTON, District Judge.

On May 13, 1998, the jury in Phase II of this trial found defendant American Home Assurance Company ("American Home") liable for common law bad faith and for three violations of the Connecticut Unfair Insurances Practices Act (Conn. Gen.Stat. § 38a–816(6)). Because CUIPA violations can be the basis for violations under the Connecticut Unfair Trade Practices Act, *Mead v. Burns*, 199 Conn. 651, 509 A.2d 11 (1986), punitive damages may be awarded (Conn.Gen.Stat. § 42–110g),

and plaintiff United Technologies Corporation ("UTC") now moves for such an award (Plaintiffs' Renewed and Supplemental Motion for Punitive Damages, [doc. # 995]).

### 1. Determination of Whether Punitive Damages Should Be Awarded

Consideration of plaintiff UTC's original post-trial motion for punitive damages was derailed by defendant American Home's post-trial disclosure of highly relevant pre-trial discovery documents, the circumstances and substance of which the Court permitted UTC to include in a renewed motion for punitive damages which is now before the Court. Defendant American Home argues in opposition that plaintiff UTC has failed to establish that any CUIPA/CUTPA violations were of the requisite willful, wanton and outrageous nature so as to warrant an award of punitive damages.

■ While UTC attempts to aggrandize the circumstances in which the Court will make such a determination with rhetoric such as: "in the annals of jury decision-making, seldom has there been a situation as extraordinary as the one with which this Court is now faced" (Mem. in Support, p. 5 [doc. # 996]), the forcefulness of this hyperbole, like much of the invective used to characterize defendant's motivations, is stronger than warranted by the evidence. However, even if the evidence does not indisputably carry "the flavor of evil" as defense counsel urged at oral argument, this pithy phraseology neglects to include the full standard, which allows a punitive damages award based on a finding of "reckless indifference to the rights of others." *Gargano v. Heyman*, 203 Conn. 616, 621, 525 A.2d 1343 (1987). In interpreting such a standard, Connecticut courts have concluded that the terms "wilful", "wanton," and "reckless" are to be "treated as meaning the same thing." *Dubay v. Irish*, 207 Conn. 518, 533, 542 A.2d 711 (1988).

■ What the evidence did demonstrate, directly and inferentially, was a very substantial insurance company faced, to its financial horror, with unanticipated environmental contamination coverage claims under "all risk" policies that did not contain contamination exclusion clauses. In response, and in short, defendant purposefully and by design abandoned all accepted claims processing procedures and principles, and instead adopted the position that "[a]ll cases are referred to Mound, Cotton and Wollan exclusively for handling." (Tamarelli Aff. Ex. C, Tab 9) [Doc. # 993]. The reasons justifying this "claims settlement practice" varied with the telling—legal coverage opinion, adjustment, investigation and coordination—but all such excuses were not born out by the evidence. Although defendant retained an adjuster (GAB) for the claims, no adjuster was ever deployed and no adjustment was ever done. Similarly, no coverage opinion was ever rendered or disclosed. While defendant's counsel to whom the claims had been referred purported to be undertaking some sort of investigation, their "need" for additional data and documents was unending in time or number. Further, while asserting that it had solid legal defenses, e.g., late notice, no coverage, no fortuity, no occurrence, defendant never denied the claims on any of these bases until plaintiff brought this suit. In related prior litigation in 1988, defendant represented to a Massachusetts state court that it was entitled to dismissal of plaintiff's claims because plaintiff had not complied with pre-suit requirements, which would afford it the opportunity to investigate, yet as of trial in May of 1998 no investigative results were ever generated. As early as November 1989, defendant recognized that "investigation will be required to determine when the property in fact became damaged, that is, when the property damage first became apparent or when the property damages could have reasonably become discoverable. In certain cases, experts may have to be consulted to deter-

mine this." (Def. Mem., Ex. 2 [doc. # 1033].) No experts were consulted.

Despite the Court's disagreement with plaintiff's characterization of defendant's venality here, the Court finds ample basis in the record for concluding that this insurer knowingly, purposefully and misleadingly engaged in reckless and wanton conduct, in willful disregard of its insured's rights to a fair claims settlement practice that utilized reasonable standards for prompt investigation and decision-making related to claims coverage. This evidence, in the Court's view, supports an award of punitive damages to deter similar violations in the future. The evidence regarding defendant's claims handling in this case was more than sufficient for the jury to properly find, as it did, that defendant American Home had no reasonable investigation or timetable standards, but instead maintained a position of claims "limbo"—neither affirming or denying coverage within a reasonable time after proof of loss statements were completed, yet still stringing along UTC with assurances that a good faith determination was forthcoming. *See,* Ruling on Motion for Judgment as a Matter of Law Re: Prejudice from Late Notice [doc. # 953].

As further discussed below, the Court finds that a "design to injure" can be implied from American Home's conduct and the circumstances, which include the financial consequence to UTC and other insureds identified on the "Arthur Index Cards" of carrying claimed covered losses without ever being able to obtain a coverage decision, while being induced to engage in apparently futile claims settlement activities, all as a direct and natural consequence of American Home's purposeful abandonment of any semblance of an acceptable claims handling process. *See Nolan v. Borkowski,* 206 Conn. 495, 501, 538 A.2d 1031 (1988).

The trial testimony of American Home's claims handling personnel made it abundantly evident that they well knew how to set up a claims processing system that met the requirements of statutory insurance claims settlement practice standards, but that an express decision was made to employ no such process in reviewing these particular types of claims. Once UTC's claims were shunted into this netherworld of non-processing, the decision to treat them in such a manner was never revisited, notwithstanding defendant's knowledge of the states' requirements.[1] There was no evidence in the testimony of American Home claims personnel at trial, or otherwise, suggesting any change by defendant in its position on its treatment of all its first party environmental claims.

Moreover, as underscored by the position expressed in Walter Owens' November 1987 memorandum (Def's. Mem. in Opp., doc. # 1033, Ex. 3.), American Home had essentially taken a no coverage position, intending to " . . . vigorously defend our position, that these are not fortuitous claims and the insurance industry should not be called upon to cure the social ills or day-to-day business operations of corporations." Yet no such definitive opinion was ever communicated to American Home's insureds, such that they could have begun the process of litigating the correctness of defendant's position earlier, and without wasteful efforts at proving losses. Further, while the requests for information by American Home's lawyers (Mound, Cotton & Wollan) to whom UTC's and other insureds claims had been sent pursuant to defendant's policy may have been generically reasonable requests, the context casts them in a different light, since no adjuster or environmental consultant was ever utilized even after receipt of some very detailed proofs of loss by UTC. The absence of any justification for relegating all claims activity to American Home's lawyers for "investigation" or "coordination"

---

1. Plaintiff has summarized the Unfair Insurance Trade Practices Acts of 48 states, which are applicable to some or all of defendant's conduct. *See* Mem. in Support, Attach. A [doc. # 996].

without end leads to but one conclusion—that defendant purposefully and completely abdicated its duty as an insurer. This absence of justification logically suggests its motivation: because a stance of non-coverage could not be supported by the policy language, and because actual adjustment or investigation might have undermined the factual basis for defendant's non-coverage stance, defendant turned to and relied on its lawyers to best position it for future eventualities,[2] appearing to await the time if and when "... inevitably the Court will probably bend and stretch in an attempt to bring the Property policies into play on a 'public policy' basis." (Def. Mem., Ex. 3 [doc. # 1033].)

Moreover, at trial, defendant's vice president expressed no reservations about the propriety of its practices, which applied to all first party environmental claims, notwithstanding its espoused policy of deciding coverage on the "particular facts" and "language of the policy" for each claim. (Def.'s Mem., Ex. 2 [doc. # 1033].) This conduct fully falls under the rubric of reckless and wanton disregard for its insureds' rights. *See Capstick v. Allstate Ins.*, 998 F.2d 810, 823 (10th Cir.1993).

The harm suffered by UTC from American Home's endless and standardless "claims settlement process" of sending all claims to the Mound, Cotton & Wollan law firm, setting minimal reserves and engaging in minimal activity is evident. (Tamarelli Aff. Ex. C, Tab 10) [Doc. # 997]. Because of this strategy, UTC not only lost the opportunity to make substantial financial gain by investing the very large sums that were instead expended for remediation of pollution damages, but also lost the opportunity to obtain a prompt denial that could be immediately tested by litigation. The concomitant financial benefit to American Home is obvious. Given the magni-

tude of the environmental contamination claims which American Home clearly recognized, delay in payment of claims or defending a prompt denial of them would naturally result in defendant's retaining control over huge sums with the resulting investment profit benefit. American Home's financial exposure which was calculable from "notices of contamination type losses from quite a few substantial insured" (Osborn Mem. dated 11/16/87, Tamarelli Aff. Ex. C, Tab 2) [Doc. # 997], were, in American Home's own words in 1987, "of concern to the Profit Center" and thus were to be treated as "Category" claims, monitored closely and promptly reported "to all the AIG Company Claim Departments." (Osborn Mem. dated 11/18/87, Tamarelli Aff. Ex. C, Tab 3) [Doc. # 997].

> "In view of this specialized potential for high-dollar involvement, these files merit the full attention of a detail-oriented individual prepared to apply a high degree of study to the elements involved and the time to attend the various meetings and conferences that will be scheduled ...."

(Cooper Mem. dated 12/6/91, Tamarelli Aff. Ex. C, Tab 6) [Doc. # 997].

In light of both the evidence presented at trial and the post-trial disclosure of internal documentation, the Court concludes that a punitive damages award is appropriate under Connecticut law.

2. Amount of Punitive Damages to be Awarded

■ Having determined that the trial evidence and post-trial-produced documents satisfy the standard of reckless and wanton disregard of insureds' rights as required for a punitive damage award under CUTPA, the Court considers the ap-

---

**2.** Defendant elected to withhold from discovery the contents of its communications with Mound, Cotton & Wollan as privileged, thus they were inadmissible at trial. Since Mound, Cotton & Wollan was trial counsel, there could be no explanatory testimony from these attorneys to dispel the clear negative inferences that no good faith claims settlement practice was underway, and that defendant did not believe it had a reasonable legal basis for denying plaintiff's claims.

propriate amount to be awarded. Plaintiff seeks an award of $318 million, or one percent of the net worth of American Home's parent, AIG, or in the alternative an award trebling all prejudgment and post-judgment interest awarded on the Windsor Locks and all future verdicts. Defendant, of course, objects to any award of punitive damages, and further argues that the amount sought by UTC is grossly excessive, as it does not conform to the guidelines set out in *BMW v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), which evaluated the size of a punitive damages award under Alabama unfair trade practices law according to: the degree of reprehensibility of defendant's conduct; the disparity between the harm or potential harm suffered by the plaintiff and the punitive damages awarded; and the difference between the punitive damages awarded and the civil penalties authorized by law or imposed in comparable cases. *Id.*, 517 U.S. at 574, 116 S.Ct. 1589.

■ Here, the degree of reprehensibility of this large insurer's disregard of its duty to its insureds is decreased in some part by the facts that the legal issues presented by UTC's claims were novel, late and high stakes, and that plaintiff was represented by counsel throughout. While defendant has repeatedly claimed that denial of coverage was reasonably debatable, inexplicably it never denied coverage and never asserted a basis for doing so, in fact or in law. Given the fiduciary nature of the relationship between insurer and insured, *Farricielli v. Nationwide Mutual Fire Ins. Co.*, 17 Conn. L. Rptr. 368, 1996 WL 488851 (Conn.Super.1996), the type of reckless indifference proved in this case is sufficiently reprehensible and in excess of mere evidence of unfair claims settlement that it warrants a sizable award, if not of the magnitude suggested by plaintiff.

As to the second *BMW* factor, implicating in part the relative power positions, while UTC is not analogous to the individual insured, struck by catastrophe, and in desperate need of insurance proceeds, and

has been well represented by creative and tenacious counsel throughout its dealings with defendant, nonetheless, the delay harm to UTC and potential harm to other first-party insureds is potentially great. Without timely insurance investigation and decision on coverage, insureds will be faced with unreasonable and unnecessary delays in obtaining resolution either by payment or judicial declaration, but still induced to engage in a futile expenditure of time and money in expectation of a coverage determination. Protection against being unreasonably "strung along" is one of the precise purposes of the CUIPA's unfair claims settlement practice requirement of prompt and fair investigation and disposition of claims. *See* Conn. Gen. Stat. § 38a–816(6). Even UTC's size does not protect it from this type of harm. Thus, although the measure of delay-based damages is not reliably calculable, because any such figure would be distorted by the factor of court delay, and although the compensatory damages award here of $878.00 for the costs of Windsor Locks proof of loss submission and $10.00 nominal damages for City of Industry are minimal, the time and opportunity loss potential is significant and thus the need here for punishment and deterrence is very real.

> "In many cases involving bad faith conduct by insurance companies or others, the actual amount in controversy may be relatively insignificant ... the consequential damages may be only nominal, but the outrage may be significant."

*Capstick v. Allstate Ins. Co.*, 998 F.2d 810, 821 (10th Cir.1993).

Defendant focuses on the final *BMW* factor, and urges examination of CUIPA's penalty provisions as providing the appropriate parameters. Under Conn. Gen. Stat. § 38a–817(b), the commissioner of consumer protection may order:

> (i) Payment of a monetary penalty of not more than one thousand dollars for each and every act or violation but not to exceed an aggregate penalty of ten

thousand dollars unless the person knew or reasonably should have known he was in violation of sections 38a–815, 38a–816, this subsection and subsection (e), in which case the penalty shall not be more than five thousand dollars for each and every act or violation but not to exceed an aggregate penalty of fifty thousand dollars in any six-month period; (ii) suspension or revocation of the person's license if he knew or reasonably should have known he was in violation of said sections and subsections.

According to defendant, this section would subject American Home to a maximum $50,000 penalty for any six month period, demonstrating that the difference between this penalty and UTC's requested punitive damages award is the paradigm of excessive.

The Court is not persuaded by American Home's argument that these monetary CUIPA penalty provisions usefully bear on a determination of the size of an appropriate punitive damages award. First, under the language of the statute, license revocation is also a potential penalty, and "[n]o insurance company ... shall do any insurance business [ ] within this state until and except while it is permitted to do so under the terms of a license issued by the commissioner...." Conn. Gen.Stat. § 38a–41. While this loss of American Home's right to do business is not readily amenable to quantification, it surely represents a substantial penalty. *See Pacific Mutual Life Ins. Co. v. Haslip,* 499 U.S. 1, 23, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) (upholding punitive damages award that was "much in excess of the fine that could be imposed for insurance fraud" under Alabama statute, as imprisonment was also authorized). Second, the *BMW* Court recognized that greater sanctions may be necessary "to deter future misconduct," where there is "a history of noncompliance with known statutory requirements." 517 U.S. at 584–85, 116 S.Ct. 1589. UTC first gave notice of its claim for City of Industry in 1987, gave notice through the Massachusetts

suit of its multi-site claim in 1987, a number of other such claims were similarly pending, and American Home's personnel had actual knowledge of the relevant statutory standards and requirements. *See* Testimony of Nancy Cooper, Testimony of Thomas Carey. The Court concludes that, in these circumstances, the *de minimis* monetary civil penalties would be wholly insufficient to punish American Home and motivate it to promptly comply with its claims processing obligations.

Further, defendant's proposed measure for any punitive damage award does not account for the intentional scheme of the insurer here, repeated nationwide and applicable to all claims by defendant's insureds for first party environmental coverage, with no attempt at correction or even acknowledgment of any deficiency. (See Testimony of Thomas Carey, Property Vice President, American Home.) It also does not take into account " ... the millions of dollars potentially at stake ...". *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 444, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), or the very substantial financial resources of American Home. *See* Carey Aff., Ex. B [Doc. # 918] (Insurance department filing indicating that American Home had a net worth of $3.18 billion in 1997). Keying the punitive damages to be awarded to either the actual damages awarded or the civil monetary penalties would, in fact, impose no punishment at all on a company that instituted no prompt investigation standards or reasonable timetable for making coverage decisions and evidenced no intention to accept or deny such coverage until forced to do so by litigation.

■ That said, the Court does not adopt the formula urged by plaintiff: that it be awarded one percent of American Home's *parent company's* net worth. AIG is not a party to this lawsuit, and the Court therefore finds it improper to use AIG's value as a measure of exemplary damages. *See United States v. Bestfoods,* 524 U.S. 51, 60, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) ("It

is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation... is not liable for the acts of its subsidiaries.") (internal citations omitted). Most of the cases cited by plaintiff are distinguishable, in that either the parent company was a named a defendant, *see, e.g. Neal v. Carey Canadian Mines*, 548 F.Supp. 357, 366 (E.D.Pa.1982), or there had been some showing that the subsidiary was merely an alter ego for the parent, *Empire Gas, Inc. v. Cartwright*, 595 So.2d 1348, 1351 (Ala. 1992). UTC made no such showing at trial, nor do the post-trial submissions suffice to persuade the Court other factors are present which adequately address the due process concerns inherent in assessing penalties against a non-party.

After much consideration of the factors to be weighed in arriving at an award which will punish and deter any further or future "parking" of claims and stringing along of insureds, or similarly outrageous claims processing practices, but will also not constitute an undue windfall to UTC, the Court declines to follow either the plaintiff's formula (one percent of AIG's net worth) or the defendant's formula (double the actual damages or the possible statutory penalty). The Court instead will look to American Home's 1997 net worth of $3.18 billion, and the jury's award of $8 million in prejudgment interest. The Court therefore awards punitive damages in the amount of $16,000,000. This award is double the amount of pre-judgment interest awarded on the Windsor Locks verdict, and so will restore to UTC some of the returns on investment opportunities that it may have lost. *See* Radin Aff., ¶ 12 [Doc. # 998] (UTC earned 17.5% on its investments in the relevant time period). Moreover, this figure is reasonable, because it amounts to roughly one-half of one percent of American Home's 1997 net worth, a percentage range in which Second Circuit has approved punitive damages awards. *See Kelco Disposal v. Browning–Ferris Industries*, 845 F.2d 404, 410 (2d Cir.1988), *aff'd* 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) (upholding punitive damages jury verdict of .6% of net worth). Finally, this figure approaches the $18 million number that UTC calculates American Home has earned on the money it unlawfully retained, a figure American Home has not disputed. Pl. Mem. in Support at 34 [Doc. # 996].

3. Conclusion

For the reasons discussed above, plaintiff's Renewed and Supplemental Motion for Punitive Damages (Doc. # 995), is GRANTED. The Court awards plaintiff $16,000,000 in punitive damages.

IT IS SO ORDERED.