UTAH FOAM PRODUCTS CO., Plaintiff,

v.

**The UPJOHN COMPANY, Defendant.**

**Civil No. 87–C–955G.**

United States District Court,
D. Utah,
Central Division.

June 27, 1996.

C. Richard Henriksen and Ralph W. Curtis, Salt Lake City, UT, for Plaintiff.

Stephen B. Nebeker, Jonathan A. Dibble, Rick L. Rose, Rick B. Hoggard, Salt Lake City, UT, for Defendant.

## MEMORANDUM DECISION AND ORDER

.J. THOMAS GREENE, District Judge.

This matter is before the court on Upjohn's Motion for Judgment as a Matter of Law, or in the alternative New Trial or Remittitur, for both compensatory and punitive damages, after trial to a jury February 20 through March 4, 1996. Also before the court is Upjohn's Objection to an award of prejudgment interest and the postjudgment interest rate as set forth in Utah Foam's proposed form of judgment. The jury determined in a Special Verdict that Upjohn, when it was a manufacturer and seller of isocya-

nate during the time period in question, made both fraudulent and negligent misrepresentations to Utah Foam, a purchaser of isocyanate. On March 1, 1996, the jury rendered a verdict in favor of Utah Foam in the amount of $313,593 in compensatory damages. On March 4, 1995 the jury returned a verdict of $5.5 million in punitive damages.

Plaintiff is represented by C. Richard Henriksen and Ralph Curtis. Defendant is represented by Stephen B. Nebeker, Jonathon Dibble and Rick Hoggard. The parties have filed extensive legal memorandums, argument was presented at a hearing on April 22, 1996, and the matter was taken under advisement. Thereafter, both parties submitted additional legal analysis relative to punitive damages in view of the Supreme Court's decision in *BMW of North America, Inc. v. Gore*, — U.S. ——, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), which was handed down after this case was argued.

## STANDARDS

### Motion for Judgment as a Matter of Law

The standard for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure is rigorous. Judgment as a matter of law is proper "only when the evidence so strongly supports an issue that reasonable minds could not differ." *Delano v. Kitch*, 663 F.2d 990, 1002 (10th Cir.1981). Courts must view the evidence in the light most favorable to the nonmoving party, without weighing the evidence, passing on the credibility of witnesses, or substituting the court's judgment for that of the jury. *Rajala v. Allied Corp.*, 919 F.2d 610, 615 (10th Cir.1990), *cert. denied*, 500 U.S. 905, 111 S.Ct. 1685, 114 L.Ed.2d 80 (1991); *Ryder v. City of Topeka*, 814 F.2d 1412, 1418 (10th Cir.1987); *Brown v. McGraw–Edison Co.*, 736 F.2d 609, 613 (10th Cir.1984). If conflicting material evidence exists, or if the evidence is insufficient to warrant a "one-way conclusion," judgment as a matter of law is inappropriate. *Zuchel v. City and County of Denver, Colorado*, 997 F.2d 730, 734 (10th Cir.1993). Accordingly, as to defendant's motion for judgment as a matter of law, this court views the evidence in this case in favor of Utah Foam and extends to it the benefit of all reasonable inferences. *Finley v. U.S.*, 82 F.3d 966 (10th Cir.1996).

### Motion for New Trial

The party seeking a new trial must demonstrate that the verdict is "not based on substantial evidence." *White v. Conoco, Inc.*, 710 F.2d 1442 (10th Cir.1983). When the verdict is clearly and decidedly against the weight of the evidence, a new trial is proper. *Getter v. Wal–Mart Stores, Inc.*, 66 F.3d 1119, 1125 (10th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1017, 134 L.Ed.2d 97; *Holmes v. Wack*, 464 F.2d 86, 88–89 (10th Cir.1972); *May v. Interstate Moving & Storage*, 739 F.2d 521, 525 (10th Cir.1984). This generally presents a question of fact to be determined by the trial court. *Brown*, 736 F.2d at 616; *Richardson v. City of Albuquerque*, 857 F.2d 727, 730 (10th Cir.1988); *see* 11 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, § 2806.

### Remittitur

When confronted with the contention that compensatory or punitive damages are excessive, the trial court may order a remittitur. *Klein v. Grynberg*, 44 F.3d 1497, 1507 (10th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 58, 133 L.Ed.2d 22 (1995). Whether a punitive damage award is excessive and requires remittitur implicates state law in diversity cases as well as federal constitutional law. *Crookston v. Fire Insurance Exchange*, 817 P.2d 789 (Utah 1991) ("*Crookston I*"); *Crookston v. Fire Insurance Exchange*, 860 P.2d 937 (Utah 1993) ("*Crookston II*"); *BMW*, —— U.S. ——, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

## FACTUAL BACKGROUND

Plaintiff presented evidence to the jury of damages resulting from Upjohn's allegedly fraudulent and negligent misrepresentations that Utah Foam would receive the "best" price in sales of isocyanate by Upjohn to Utah Foam. Plaintiff's experts compared transactions between Upjohn and Utah Foam with transactions between Upjohn and competitors of Utah Foam in order to establish damages which resulted from price differentials or "lost margins." To determine

the comparative price, plaintiff's experts identified invoices and other documents and opined that adjustments which were granted by Upjohn to certain competitors of Utah foam for such things as freight allowances and packaging differentials resulted in price advantages to such competitors to the detriment of Utah Foam. The experts used their own judgment to determine (1) the time frame in which to compare invoices, (2) how to use the invoices, (3) how to arrive at an appropriate freight allowance, (4) how to calculate and compare packaging differentials, and (5) how to calculate and quantify other special adjustments. In doing so, Charles Peterson and Kenneth Brown, plaintiff's experts, made different judgment calls and used different approaches in calculating damages. For instance, (1) Peterson generally used a 30 day time frame while Brown made comparisons within a 60 to 90 day time frame; (2) Peterson generally made comparisons using single invoices, although on three comparisons he averaged multiple invoices and credits; Brown did not average any invoices; (3) Brown computed average freight allowances to competitors of Utah Foam in some instances and in other instances used only actual freight allowances; Peterson used the actual freight allowance given on the invoice, except for three comparisons in which he utilized a weighted average; (4) Peterson used Utah Foam's contract price list in order to establish the price differential in packaging costs between Utah foam and its competitors, except that when Utah Foam's price list was unavailable he used Upjohn's general price list; Brown used Upjohn's general price list for all transactions except that for certain transactions closer in time he used Utah Foam's contract price list. Both declined to use the Upjohn marketing price book. Brown and Peterson differed on 24 of the 49 packaging differentials. In addition, (5) both exercised judgment in opining that certain special situations were intended and actually resulted in price reductions to competitors. This includes the granting of credits by Upjohn for use of out-of-spec ma-

terial, testing the product, settlement of a damage claim, and staggered price increases.

It was apparent that plaintiff's experts were unable to arrive at a precise damage figure concerning "lost margins" in pretrial proceedings or at trial. Using 53 comparisons in his report submitted before trial, Peterson calculated plaintiff's lost margin loss at $329,846. He estimated additional damages of $89,720 for 1981, 1982, and 1985, years where comparable invoices were not available. Peterson's total lost margins damage figure was $419,566. Brown prepared an early 1995 report in which he calculated plaintiff's lost margin loss at $336,525. He estimated additional damages at 176,675, for a total lost margins figure of $513,200. Brown and Peterson had different figures on at least 22 of the 53 comparisons.

After a pre-trial court ruling,[1] Peterson revised his report to include 62 comparisons which resulted in $440,017 in lost margin damages. He estimated additional lost margins for fiscal years 1979–1982 of $443,986. Also, Peterson calculated "lost sales" for fiscal years 1983–1985. Brown arrived at a new lost margins figure of $450,358 with the 62 comparisons. He estimated additional damages of $150,119, but did not calculate lost sales. Brown and Peterson differed in 33 of the 62 comparisons.

The court rejected the "estimated" and the newly proffered "lost sales" figures presented on the eve of trial, and plaintiff withdrew three comparisons. The experts then revised their calculations as to the remaining 59 comparisons: Peterson's lost margins figure increased to $447,515 (from $440,017 on 62 transactions) and Brown's figure decreased to $423,332 (from $450,358 on 62 transactions). Brown and Peterson still arrived at different figures on 20 of the 59 comparisons.

Testimony at trial concerning freight allowances was confusing and contradictory. Bruce Wilson, president of Utah Foam, testified that he understood that Upjohn would always grant four cents per pound freight allowance to customers who picked up the

---

1. In November 1995 the court ordered production of records in the possession of Upjohn relating to its Papi 135 product during 1983 to 1985 for use in comparative sales analysis concerning the Upjohn Papi 27 product.

product at the factory outlet.[2] Upjohn presented evidence that it based freight allowances on the published tariffs.[3] A competitor of Utah Foam testified that Upjohn would allow freight costs of at least $1.00 per mile.[4] Based upon that evidence during trial, the court removed from consideration by the jury $133,921 in the calculations of defendant's experts.[5]

From the aforesaid various and conflicting presentations of evidence, the jury apparently chose Peterson's calculations, based at least in part on an exhibit presented after his testimony was completed which the parties stipulated he would have identified as his work product if he had been called to further testify. That exhibit purported to spread the losses he had calculated into yearly time frames.

It was apparent from all of the evidence at trial that the calculation of damages and the spreading of such into time frames required determination from disputed and conflicting evidence. The damages claimed could not be calculated with mathematical accuracy. The

amount of damages was uncertain and speculative and could not be known until such was fixed at trial by the jury.

## I. COMPENSATORY DAMAGES

Upjohn moves to vacate or adjust the jury's award of $313,593 in compensatory damages pursuant to Rule 50(b) Fed.R.Civ.P. Upjohn claims that there is no evidence upon which a reasonable jury could have found (1) that Upjohn intended to defraud Utah Foam; (2) that Utah Foam reasonably relied on the alleged fraudulent or negligent misrepresentations; (3) that Upjohn negligently breached any industry standard of care; and (4) that Utah Foam sustained any compensable damages on its negligent misrepresentation claim. These matters will be discussed seriatim.

### A. Intention of Upjohn Concerning Fraudulent Misrepresentations

#### (1) In General

■ Upjohn submits that undisputed evidence was presented that it believed its rep-

---

**2.** Mr. Wilson's testimony was as follows:

> Q: And was there an instance that occurred where you actually had some material picked up or delivered a short distance from the Upjohn plant?
> A: Yes.
> Q: All right. And what was the credit that was issued?
> A: Four cents a pound.
> Q: What were you told about that four cents a pound?
> A: That that was the standard freight allowance anywhere in the continental 48.
> 2 Tr. (Wilson) 59.

**3.** Charlotte Jane Guerrero, a rate analyst with Upjohn from 1978 to 1985, testified as follows:

> A: Our freight rates were based on published common carrier tariffs which had commodity freight rates in those tariffs. And the SPL in this case stood for synthetic plastic · liquid which was a commodity in these particular tariffs.
> Q: So tariffs were different for different commodities?
> A: Yes. The tariffs were different for the tank truck or tank wagon shipments, and they were different tariffs for the tank car shipments, package goods.
> 7 Tr. (Guerrero) 105.

**4.** Gale Vosburg, former president of Chemetics, testified that "the cost to [his] company in pick-

ing up the material down in Houston and bringing it up to Los Angeles," a 1,541 mile trip, would be about $1,600, or roughly $1 per mile. 3 Tr. (Vosburg) 25.

**5.** The court instructed the jury that determination of the amount of freight allowance relative to the transactions in question was in dispute:

> There has been evidence that Mr. Wilson of Utah Foam was told that freight allowances to "will call" customers were equal to 4 cents per pound, regardless of destination within the continental United States. Other evidence was to the effect that freight allowances could be approximated by mileage at approximately one dollar per mile. Utah Foam claims that freight allowance should be measured by the cost to the customer to do his own shipping. Upjohn claims that freight allowances were granted on the basis of what it would cost Upjohn to ship, measured by published tariff rates. The court has determined as a matter of law that there should be no reduction in the price calculations to customers for freight allowances equal to or less than 4 cents per pound. The court also has determined that the total of all freight allowances, which should not in any event be regarded as a reduction in price, was $133,-921. The jury is free to determine whether or not freight allowances which may be found to exceed that amount should be regarded as a reduction in the price of isocyanate which Upjohn sold to competitors of Utah Foam.

resentations to plaintiff about "best price" were true based on *"net delivered price" (invoice price),* and that Utah Foam consistently received the lowest price of any "systems house" customer. Upjohn insists that the manner in which it calculated price was reasonable and consistent with good faith, and that as a matter of law the verdict based upon a finding of fraud should be overturned.[6]

Utah Foam presented evidence that as to certain transactions the *actual effective price* given to competitors was lower than the "best price." The resulting price differentials or "lost margins" were not based upon invoice prices but rather upon freight allowances, packaging cost differentials, volume rebates, credit terms, and to some extent special discounts based upon credits given for testing the product, non-uniform or "staggered" dates when price increases became effective, discounts for purchase of usable "out-of-spec" product, and a damage claim payment.

■ Upon review, this court determines that the evidence at trial was sufficient under a clear and convincing standard for a jury to have determined that Upjohn acted with intent to defraud Utah Foam by making misrepresentations on which Utah Foam relied as to certain transactions presented to the jury. Accordingly, the court denies Upjohn's motion for judgment as a matter of law because the evidence was not so strong on the issue of Upjohn's fraudulent intent that reasonable minds could not differ.

### (2) Special Credits Given to Competitors of Utah Foam

Upjohn claims in the alternative that compensatory damages for fraudulent mis-

representation should be reduced because a reasonable jury could not have found that Upjohn intended to defraud Utah Foam as to particular transactions where credits were allowed to competitors. In this regard, Upjohn claims that "special credits and situations" granted to competitors of Utah Foam do not show any intent to defraud and should be disallowed as a matter of law. Utah Foam claims that these transactions amounted to "discounts and preferential terms" which were based upon substantial evidence, constituting a part of the pattern of Upjohn's fraud. The items in question are (1) testing charge reimbursements, (2) staggered price increase, (3) "out-of-spec" discount, and (4) damage claim payment.

### (a) *Testing Charge Reimbursements*

In comparisons 4 and 5, Utah Foam's experts reduced Southwest Distributing's price for isocyanate by ten cents per pound because of reimbursements by Upjohn for testing charges incurred by Southwest.

Utah Foam claims that an inference properly could have been made by the jury that granting such credits in effect constituted a price reduction. Upjohn contends that it granted the credits on its good faith belief that Southwest actually incurred approximately $40,000 in testing costs and that granting such credits constituted a recognized industry custom and practice.

Gail Vosburg, former president of Chemetics, a competitor of Utah Foam, testified that Chemetics would often ask for and get isocyanate for free for testing purposes, thus lowering its research and development costs and the effective net price of the product.[7] Vosburg testified that he negotiated for such

---

Jury Instruction No. 38.

**6.** The following elements are required under Utah law to establish fraud: (1) the defendant made a false or misleading statement, (2) and either knew the statement was false or misleading or made it with reckless disregard for its truth or falsity, (3) the statement was of material fact, (4) the defendant made the statement with the intent that plaintiff rely on the false or misleading representation, (5) plaintiff reasonably relied on the false or misleading representation, and (6) plaintiff suffered damages as a result of relying on the false or misleading representation.

*Pace v. Parrish,* 122 Utah 141, 247 P.2d 273, 274–75 (1952); *Dugan v. Jones,* 615 P.2d 1239, 1246 (Utah 1980); *Taylor v. Gasor, Inc.,* 607 P.2d 293, 294 (Utah 1980).

**7.** When asked how this test material benefited Chemetics, Mr. Vosburg stated: "This was part of our R and D cost so anything we could do to reduce that by getting the isocyanate suppliers to supply material for that purpose." Vosburg agreed that rather than "using something you had to pay for, [he] would use something [he] would get for free for testing[.]" 3 Tr. (Vosburg) 17–18.

testing material with Upjohn as well as other isocyanate suppliers in order to reduce costs.[8]

This court deems the evidence to be sufficient upon which the jury could have determined that the testing reimbursements given to Southwest by Upjohn were intended preferentially to reduce and did reduce Southwest's price. Accordingly, the compensatory damages award is not reduced by $16,848 as urged by Upjohn concerning that matter.

### Staggered Price Increase

Upjohn claims that in comparison 23 Utah Foam improperly used a staggered price increase to assert a loss of $15,552. Utah Foam asserts that Upjohn would benefit certain customers by timing the price increases.

A general price increase went into effect and applied to purchases by Utah Foam on and after January 1, 1980. However, the price increase was not applied to Chemetics until February 1, 1980. Chemetics was permitted to purchase isocyanate in January 1980 in competition with the higher price charged to Utah Foam in that month. Shipments to Chemetics after February 1, 1980 reflected the general price increase.

Upon review, the court finds that sufficient evidence was presented to the jury to justify its determination that the price increase on this occasion was staggered for the benefit of Southwest Distributing. Accordingly, the compensatory damages award is not reduced by $15,552 as urged by Upjohn concerning the Chemetics transaction.

### Out-of-Spec Discount

On occasion, isocyanate suppliers including Upjohn would experience plant outages which would result in the manufacture of "out-of-spec" product. Suppliers would then offer this material at reduced rates.

Utah Foam asserts that the "out-of-spec" designation was just another way that Upjohn would supply fully usable material to certain customers at reduced prices. Vosburg testified that Chemetics had to check the "out-of-spec" product to make sure it was "usable," but would negotiate for "out-of-spec" materials from its four isocyanate suppliers, including Upjohn.[9] The record does not reflect actual purchases by Chemetics of "out-of-spec" materials from Upjohn during the time period, but Ms. Valladolid acknowledged that Upjohn routinely granted a discount for isocyanate product which did not meet its specifications.[10]

The comparison presented to the jury involved an "out-of-spec" shipment which had been sent by Upjohn to a customer in Illinois and was rejected because of high acidity. Southwest Distributing agreed to buy the rejected material at a discount because it was

---

**8.** Mr. Vosburg stated: "We also at times asked for either free material for purposes of making tests of proprietary systems and oftentimes we got it or we would ask them to do special testing work for us . . ." 3 Tr. (Vosburg) 17.

Utah Foam also claims that Lois Valladolid, the assistant to James Burt, Upjohn's Polymer Division director, testified at trial that such credits were given in order to meet prices of competitors and to match certain benefits given by other suppliers of isocyanate. However, Utah Foam's reference to Ms. Valladolid's testimony has to do with freight allowances rather than testing charges. The transcript is as follows:

Q: So Empro and Southwest and all of these companies, what you believe is they didn't get any benefit from getting a freight allowance more than what their actual costs may have been?
A: Well, they were getting the benefit already from our competition.
Q: All right. But if it's a benefit from the competition, then wouldn't it have been a benefit from you, also?

A: It would have been. If we wanted a piece of the business, we had to meet it or we would not have had it.
7 Tr. (Valladolid) 86.

**9.** Mr. Vosburg stated that isocyanate manufacturers "would offer [out-of-spec] product to customers at a lower price." When asked if the out-of-spec product was usable he said "usually it was." 3 Tr. (Vosburg) 34.

**10.** Ms. Valladolid testified as follows:

Q: If Southwest could use that material, it was satisfactory for them, why is it that you would give them a large reduction off of the price of that material?
A: It may be that the customer in order to use the material in his plant may have had to make some adjustment and the two cent per pound would have made it worthwhile to him. And also to take a shipment that he was not—had not elected to take by putting an order in and that he felt maybe he was doing Upjohn a favor.

able to use material with higher acidity. Ms. Valladolid's testimony was undisputed that it would have cost more for Upjohn to reship, rework and resell the rejected material than to have it sold to Southwest.[11] This was the only specific transaction presented involving allegedly "out-of-spec" products.

On review, this court finds that the isolated transaction presented was insufficient for the jury reasonably to determine that Upjohn intended to defraud Utah Foam. Accordingly, the compensatory damage award is reduced by $3,186 as to this transaction.

*Damage Claim Payment*

In comparison 49, Utah Foam deducted a payment that Upjohn made (by way of a credit memo) to Anchor Foam to resolve a damage claim made against Upjohn on a prior shipment. Undisputed evidence was to the effect that rather than settlement by direct payment, the damage claim was resolved by granting a reduction in the price of the subsequent shipment.

On review, the court finds that the evidence presented on this matter was not sufficient for the jury reasonably to determine that Upjohn had any intent to defraud Utah Foam. Accordingly, the compensatory damage award is reduced by $6,833.89 as to this transaction.

**2.** *Reliance by Utah Foam on Fraudulent and/or Negligent Misrepresentations*

▪▪▪ Upjohn claims that Utah Foam was sophisticated, knowledgeable and totally aware of the market and practice of Upjohn and other isocyanate manufacturers and sellers which granted freight allowances to customers who chose to pick up product and transport at their own expense, as well as the other allegedly preferential adjustments. Upjohn insists that Utah Foam and the industry regarded the "net delivered price" indicated on invoices as determinative of price received, and that in fact Utah Foam in virtually all instances did receive Upjohn's "best price." [12]

Bruce Wilson testified that on many occasions his company was assured by agents of Upjohn that Utah Foam was being given the "best price" on its purchases.[13]

Upon review, this court determines that the evidence at trial was sufficient for a jury to determine that Utah Foam relied upon fraudulent and negligent misrepresentations by Upjohn as to certain transactions. Accordingly, Upjohn's motion for judgment as a matter of law as to this issue is denied because the evidence was not so strong that reasonable minds could not differ.

**C.** *Negligent Breach of Standard of Care*

▪▪▪ Upjohn submits that there was no evidence that its pricing practice based upon "net delivered price" failed to meet the standard of care set by the industry under Utah Foam's alternative theory of negligent misrepresentation.[14] In this regard, Upjohn presented evidence of the standard of care in the industry as reflecting widespread use of

7 Tr. (Valladolid) 47.

11. Ms. Valladolid testified:
There was a 2 cent per pound reduction given for the off-spec material. But that 2 cents per pound was more than offset in the charge it would have been for us to pay to bring the full tank car back to the plant, re-work it through production and then ship it out again to another customer.
6 Tr. (Valladolid) 225–26.

12. Lois Valladolid stated that Upjohn tried to keep Utah Foam competitive in price, meaning giving it the lowest invoiced price. She said: "The invoice price is the price that we always discussed." 6 Tr. (Valladolid) 208. When asked what the relationship of net delivered price is to the invoice price, she said: "That is the price the customer paid per pound for the product, just for the product delivered." 7 Tr. (Valladolid) 5.

13. Bruce Wilson testified that James Burt, the Polymer Division director, told him that Utah Foam was "getting the best price of anyone." Wilson remembers Burt saying that Utah Foam "was buying at the largest volume and [was] a contract customer and that that was the best there was." 2 Tr. (Wilson) 39.

14. Negligent misrepresentation is established in Utah by showing (1) a false or misleading statement, (2) failure to exercise reasonable care, (3) materiality, (4) the party making the statement was in a superior position to know the materials facts, (5) expectation that the other party would reasonably rely, (6) reasonable reliance, and (7) resultant damages suffered. *Jardine v. Brunswick Corp.*, 18 Utah 2d 378, 423 P.2d 659, 661–62 (1967); *Christenson v. Commonwealth Land Title Ins. Co.*, 666 P.2d 302, 305 (Utah 1983); *Price–Orem Inv. Co. v. Rollins, Brown & Gunnell,*

the very practices and alleged "price adjustments" complained about by Utah Foam. Utah Foam presented evidence that the representations by Upjohn regarding "best price" upon which Utah Foam relied would have resulted in a lower *actual* price, regardless of industry practices.

Upon review, this court determines that the evidence at trial was sufficient for a jury to determine, under a negligent misrepresentation theory, that Upjohn failed to meet the standard of care which was in effect between Upjohn and Utah Foam. Accordingly, Upjohn's objection is denied because the evidence was not so strong that reasonable minds could not differ.

### D. *Damages Based on Negligent Misrepresentation*

 Upjohn argues as a matter of law that submission of the theory of negligent misrepresentation to the jury constituted error because in substance it permitted the jury to measure damages based upon the contractual "benefit of the bargain" standard, citing *Forsberg v. Burningham & Kimball,* 892 P.2d 23 (Utah App.1995).[15]

Upjohn argues that Utah Foam suffered no pecuniary loss since the difference between what Utah Foam paid and what it allegedly should have paid (what its competitors paid on certain transactions) constitutes an *expectancy* of pecuniary advantage, not pecuniary loss. In this regard, Upjohn claims that Utah Foam's failure to prove

market value precludes it from proving loss. Utah Foam, on the other hand, maintains that it did not need to establish market value in the usual sense in order to determine its damages because of its reliance on the special arrangement between it and Upjohn.[16]

In this case, the relevant market as presented to the jury consisted of Utah Foam and its competitors, and damages were computed on the amount necessary to compensate Utah Foam for pecuniary losses it suffered in reliance upon Upjohns' misrepresentations. Utah Foam's losses were not what any person in the market would pay to purchase isocyanate, but what its competitors actually paid as compared with what Utah Foam had to pay. This court considers that Utah Foam presented the proper measure of damages for negligent misrepresentation under the circumstances of this case.

Upon review, it appears to the court that the evidence at trial was sufficient for a jury to determine that Utah Foam suffered damages as a result of Upjohn's negligent misrepresentations. Accordingly, Upjohn's objection is denied because the evidence was not so strong that reasonable minds could not differ.

## II. *PREJUDGMENT INTEREST ON COMPENSATORY DAMAGE AWARD*

 The applicable law on the issue of prejudgment interest in the State of Utah is as follows:

and its purchase price or other value given," id. § 552B(1)(a), and any "pecuniary loss suffered ... as a consequence of the plaintiff's reliance upon the misrepresentation," id. § 552B(1)(b).
892 P.2d at 27.

---

713 P.2d 55, 59 (Utah 1986); *see generally,* Restatement (Second) of Torts § 552 (1965). The parties do not dispute that Upjohn had a pecuniary interest in the transactions, sometimes regarded as another element of negligent misrepresentation.

15. In *Forsberg,* defendants' represented to plaintiffs that they were purchasing a lot which included a row of poplar trees, but a survey later showed that the trees were not included in the lot. The Utah Court of Appeals affirmed the trial court's finding of negligent misrepresentation and set forth the applicable measure of damages:
The proper measure of damages in an action for negligent misrepresentation is that "necessary to compensate the plaintiff for the pecuniary loss to him which the misrepresentation is the legal cause." Restatement (Second) of Torts § 552B(1) (1976). Such damages may include "the difference between the value of what [plaintiff] has received in the transaction

16. Utah Foam argues that:

[its] damages are illustrative of the market value of the isocyanate purchased from Upjohn. The relevant market is defined as those companies purchasing from Upjohn. The plaintiff's damages calculations merely illustrate the difference between the value of the product sold to Utah Foam and the value of the product sold to Utah Foam's competitors. That difference in value is due to the freight allowances, packaging differentials, volume rebates, and other miscellaneous credits given to the buyers.
Plaintiff's Memorandum in Opposition, p. 27.

[W]here the *damage is complete* and the amount of the loss is *fixed as of a particular time,* and that loss can be *measured by facts and figures,* interest should be allowed from that time and not from the date of judgment. On the other hand, where damages are *incomplete* or *cannot be calculated with mathematical accuracy* ... the amount of the damages must be ascertained and assessed by the trier of the fact at the trial, and in such cases prejudgment interest is not allowed.

*Bjork v. April Indus., Inc.,* 560 P.2d 315, 317 (Utah 1977) (emphasis added), *cert. denied,* 431 U.S. 930, 97 S.Ct. 2634, 53 L.Ed.2d 245 (1977).[17]

The law as stated above was reaffirmed by the Supreme Court of Utah in *Cornia v. Wilcox,* 898 P.2d 1379 (Utah 1995), upholding the trial court's denial of prejudgment interest because of uncertainty in the computation of damages which couldn't be calculated with mathematical accuracy.[18] Likewise, prejudgment interest was denied in *Price–Orem Inv. Co. v. Rollins, Brown & Gunnell, Inc.,* 784 P.2d 475, 483 (Utah App.1989), because damages were not "determined with mathematical precision, [and] may be inherently uncertain." [19]

■ In the case at bar, damages could not be calculated with certainty and the jury had to ascertain and determine the damages to be awarded from conflicting evidence, concerning adjustments in price. Also, the jury had to choose between the inconsistent methods and assumptions used by plaintiff's experts for calculation of damages. Such evidence does not constitute a valid basis for an award of prejudgment interest in Utah. *Andreason v. Aetna Casualty & Surety Co.,* 848 P.2d 171 (Utah App.1993); *Cornia,* 898 P.2d at 1386–87. It was not obvious that the damages could be arrived at and measured from facts and figures which were fixed at particular times. Price adjustments were uncertain and had to be ascertained from conflicting evidence at trial, with no mathematical accuracy. Accordingly, this court grants Defendant's Objection and denies Plaintiff's proposed award of prejudgment interest.

## III. PUNITIVE DAMAGES

Pursuant to Rule 50(b) Fed.R.Civ.P., Upjohn moves for judgment as a matter of law vacating the jury's award of $5.5 million in punitive damages, claiming that no exceptional circumstances were presented to justify the award. In the alternative, Upjohn moves pursuant to Rule 59 Fed.R.Civ.P. for a new trial or remittitur on the grounds that the award is grossly excessive and violates Utah and federal law. Upjohn argues that the 17½ to 1 ratio ($5.5 million in punitives to $313,-593 in compensatory damages) is presumptively excessive in Utah, and that based upon the evidence presented at trial the punitive damage award by the jury was outrageously and unreasonably excessive, apparently based upon passion and prejudice. Utah Foam claims that the punitive damage award appropriately reflects the egregious nature of Upjohn's conduct.

### A. Motion for Judgment as a Matter of Law or for New Trial

#### 1. Federal Law

■ The Supreme Court recently addressed the constitutionality of excessive pu-

---

**17.** In *Klinger v. Kightly,* 889 P.2d 1372, 1381 (Utah App.1995), the Utah Court of Appeals recently stated that when damages are "uncertain or speculative until fixed by the factfinder" prejudgment interest is not awarded. *See also Canyon Country Store v. Bracey,* 781 P.2d 414, 422 (Utah 1989); *First Security Bank of Utah v. J.B.J. Feedyards, Inc.,* 653 P.2d 591, 600 (Utah 1982); *Bellon v. Malnar,* 808 P.2d 1089, 1097 (Utah 1991); *Cornia v. Wilcox,* 898 P.2d 1379 (Utah 1995); *James Constructors, Inc. v. Salt Lake City Corp.,* 888 P.2d 665 (Utah App.1994).

**18.** The Utah Supreme Court noted:

[T]he jury heard conflicting testimony from experts regarding the cattle's expected pregnancy rates, weight range, loss rates, and market prices. In addition, the jury heard divergent evidence regarding the calves' expected gender, weight range, mortality rates, and market prices.

*Cornia,* 898 P.2d at 1387.

**19.** In *Jorgensen v. John Clay & Co.,* 660 P.2d 229, 230 (Utah 1983), prejudgment interest was allowed because damages were certain—"there was no dispute as to the number or price of the sheep that were to be sold."

nitive damages in *BMW of North America, Inc. v. Gore*, —— U.S. ——, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).[20] Relative to the claim that an award of punitive damages may be violative of the Due Process Clause, the Court said:

> Only when an award can fairly be categorized as "grossly excessive" in relation to those interests does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment.

> \* \* \* \* \* \*

> Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that a State may impose.

*Id.* at —— and ——, 116 S.Ct. at 1595 and 1598. The Court established three "guideposts" which indicate whether a punitive damage award is constitutionally excessive: (1) the degree of reprehensibility of defendant's conduct, (2) the ratio between the plaintiff's compensatory damages and the amount of the punitive damages, and (3) the difference between the punitive damages and the civil or criminal sanctions that could be

imposed for comparable misconduct. *Id.* at —— – ——, 116 S.Ct. at 1597–1603.

### Degree of Reprehensibility

■ As to the degree of reprehensibility, the Court stated that "punitive damages may not be 'grossly out of proportion to the severity of the offense,' "[21] and said:

> "That conduct is sufficiently reprehensible to give rise to tort liability, and even a modest award of exemplary damages, does not establish the high degree of culpability that warrants a substantial punitive damages award."

*Id.* at ——, 116 S.Ct. at 1601.

### Ratio Between Compensatory and Punitive Damages

■ As to the second guidepost, the Court noted that the ratio between compensatory and punitive damages is the "most commonly cited indicium of an unreasonable or excessive punitive damages award" and said that "exemplary damages must bear a 'reasonable relationship' to compensatory damages ..." *Id.* at ——, 116 S.Ct. at 1601. However, the Court rejected a simple mathematical formula for establishing the "constitutional line" between excessive and nonexcessive awards.[22]

---

**20.** In *BMW*, the Supreme Court held that a $2 million punitive damages award was grossly excessive in light of the low level of reprehensibility of defendant's conduct and the 500 to 1 ratio of punitives to compensatory damages. Defendant BMW had decided not to advise its dealers of pre-delivery damage to new cars when the cost of repair was less than 3 percent of the car's suggested retail price. The jury returned a verdict of $4,000 in compensatory damages, and $4 million in punitive damages. The Alabama Supreme Court reduced the award to $2 million, finding that the jury improperly computed the punitive damages by multiplying the plaintiff's compensatory damages by the number of similar sales in other jurisdictions.

**21.** Quoting *Pacific Mutual Life Ins. Co. v. Haslip*, 499 U.S. 1, 22, 111 S.Ct. 1032, 1045, 113 L.Ed.2d 1 (1991). —— U.S. at ——, 116 S.Ct. at 1599. The Court further stated that "some wrongs are more blameworthy than others ...,[that] nonviolent crimes are less serious than crimes marked by violence or the threat of violence ...," (and that) "trickery and deceit" is "more reprehensible than negligence," id., and went on to hold that the punitive damage award against BMW was grossly excessive: "[T]he record in this case discloses no deliberate false

statements, acts of affirmative misconduct, or concealment of evidence of improper motive, such as were present in *Haslip* and *TXO*." *Id.* at ——, 116 S.Ct. at 1601.

**22.** The Court stated:

> Of course, we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award. Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine. It is appropriate, therefore, to reiterate our rejection of a categorical approach. Once again, "we return to what we said ... in *Haslip*: 'We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. We can say, however, that [a] general concer[n] of reasonableness ... properly enter[s] into the constitu-

*Sanctions for Comparable Misconduct*

 The Court identified civil or criminal penalties that could be imposed under state law for "comparable misconduct" as the "third indicium of excessiveness" in such awards. *Id.* at ——, 116 S.Ct. at 1603. Regarding this third guidepost, the Court instructed reviewing courts to "accord 'substantial deference' to legislative judgments concerning appropriate sanctions for the conduct at issue." *Id.* (*quoting Browning–Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 301, 109 S.Ct. 2909, 2934, 106 L.Ed.2d 219 (1989) (O'Connor, J., concurring in part and dissenting in part)). In this regard, the Supreme Court noted that "lesser deterrent[s]" might also adequately protect consumers." *Id.* at ——, 116 S.Ct. at 1603.

Applying the aforesaid principles to the facts in *BMW*, the Court pointedly observed that "the $2 million economic sanction imposed on BMW is substantially greater than the statutory fines available in Alabama ..." *Id.* at ——, 116 S.Ct. at 1603. (The maximum civil penalty for a violation of Alabama's Deceptive Trade Practices Act is $2,000.)

### 2. Utah Law

 The controlling Utah law regarding punitive damages is set forth by the Utah Supreme Court in the *Crookston* decisions:

> tional calculus.' " In most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis.
> *Id.* at ——, 116 S.Ct. at 1602 (citations omitted). As to the particular award against BMW, the Court ruled that the 500 to 1 ratio reflected a "disparity in this case" that was "dramatically greater than those considered in *Haslip* and *TXO*." *Id.* at ——, 116 S.Ct. at 1601. The Court said that *Haslip's* 4 to 1 ratio did not "cross the line into the area of constitutional impropriety" although it was close. *Id.* at ——, 116 S.Ct. at 1602. The Court upheld a 10 to 1 ratio in *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 462, 113 S.Ct. 2711, 2722, 125 L.Ed.2d 366 (1993), by relying on "the difference between that figure and the harm to the victim that would have ensued if the tortious plan had succeeded." *BMW*, —— U.S. at ——, 116 S.Ct. at 1602.

**23.** The seven factors are: (I) the relative wealth of the defendant; (ii) the nature of the alleged misconduct; (iii) the facts and circumstances surrounding such conduct; (iv) the effect thereof on the lives of the plaintiff and others; (v) the

*Crookston v. Fire Insurance Exchange*, 817 P.2d 789 (Utah 1991) (*"Crookston I"*) and *Crookston v. Fire Insurance Exchange*, 860 P.2d 937 (Utah 1993) (*"Crookston II"*). In *Crookston I* the Court established guidelines that "retain the advantages of flexibility but clearly set parameters beyond which awards may not go without some expressed justification." 817 P.2d at 808. The Court acknowledged the relevance of seven factors previously discussed by the Court in other cases and utilized them in assessing the amount of punitive damages.[23] *See Bundy v. Century Equip. Co.*, 692 P.2d 754, 759 (Utah 1984); *Von Hake v. Thomas*, 705 P.2d 766, 771 (Utah 1985). The Court noted some difficulty, however, in applying the factors without statutory relative weights, standards or formulas.[24] As to the factor of "the amount of actual damages awarded," however, the court fashioned a "reasonable and rational" test. In this regard, the Court said:

> Among the seven factors we have repeatedly listed that should be considered in determining the amount of a punitive damage award is the "amount of actual damages." *Although we have not articulated any standard for determining the importance to be assigned this factor, we have said that the amount of a punitive damage award generally must bear a*

probability of future recurrence of the misconduct; (vi) the relationship of the parties; and (vii) the amount of actual damages awarded. *Crookston I*, 817 P.2d at 808.

**24.** The Court said:

> Our cases have done little more than list these factors. No relative weights have been assigned them, and no standards or formulas have been established for properly evaluating them when making an award or when reviewing the propensity of a jury award. This makes such an enterprise highly problematic for judge and jury. The finder of fact has no guidance on how much weight to give each factor or even how the factors should be assessed. And nothing suggests to the jury or the trial court that there is any sort of limit or ceiling on an award.
> *Crookston I*, 817 P.2d at 808. The Court noted that the "problem that results from this lack of guidance to juries and trial courts is exemplified by disparate ratios of punitive to actual damages that appear in separate cases involving similar conduct." *Id.*

*"reasonable and rational" relationship to the actual damages.* The punitive damage awards we have characterized as violating this "reasonable and rational" relationship rule have been labeled *"grossly disproportionate" to the actual damages awarded* and have been said to be the result of passion or prejudice. These awards have been either reduced by the trial court directly or remanded to the trial court for further proceedings.

817 P.2d at 809–10 (emphasis added).

Under the "reasonable and rational" relationship standard articulated by the Utah high court, the "general rule" is that ratios above 3 to 1 for smaller awards (below $100,000) are excessive, and that "the acceptable ratio appears lower" than 3 to 1 for larger awards (above $100,000).[25] *Crookston I*, 817 P.2d at 810. The court cited three prior Utah cases where punitive damages were at or above $100,000.[26] In two of the cases the awards were upheld ($500,000, a 1 to 1 ratio; and $200,000, a ½ to 1 ratio). In the other, an award of $100,000 in punitives (3 to 1 ratio) was reduced to $50,000 (2 to 1 ratio). 817 P.2d at 810. Since the ratio of compensatory to punitive damages in *Crookston I* was "much higher than in any case where we have upheld a punitive damage award,"[27] the Supreme Court of Utah remanded the case to the trial court.

In *Crookston II*, even though the 5 to 1 ratio on remand was reaffirmed by the trial court the punitive damage award was upheld. In that instance, the Utah Supreme Court declared that the punitive damages award properly could exceed the 3 to 1 ratio under its rule of thumb parameters because the trial court on remand had extensively documented the defendant's egregious conduct.[28] In upholding the award, the court reiterated that punitive damage awards beyond the 3 to 1 ratio are unique and exceptional and must be scrutinized. The court noted that such awards are presumptively invalid:

> Specifically, we said that an award exceeding the patterns of ratios observed in our prior cases raises a *presumption that the award is excessive* and that a failure by the trial court to reduce the award or order a new trial is an abuse of discretion. To overcome this presumption, the trial court must explain why this case is unique, usually in terms of one of the established seven factors or "some other factor that seems compelling."

*Crookston II*, 860 P.2d at 939 (emphasis added).

Notwithstanding the aforesaid, this court is satisfied that an award of some amount of punitive damages was warranted

---

**25.** The Court said that "we have indicated some inclination to overturn awards having ratios of less than 3 to 1." 817 P.2d at 810. This court reads the statement by the Utah Supreme Court as indicating that even awards with ratios of less than 3 to 1 must be scrutinized and may be subject to further reduction. In this regard, in *First Security Bank v. J.B.J. Feedyards, Inc.*, 653 P.2d 591 (Utah 1982), the Court reduced an award from a 3 to 1 ratio to a 2 to 1 ratio.

**26.** *Von Hake v. Thomas*, 705 P.2d 766, 772 (Utah 1985); *Synergetics v. Marathon Ranching Co.*, 701 P.2d 1106, 1113 (Utah 1985); *First Security Bank*, 653 P.2d at 598–99.

**27.** The *Crookston* jury awarded $815,826 in compensatory damages and $4 million in punitive damages, a 5 to 1 ratio. 817 P.2d at 812.

**28.** Unlike the case at bar, the actions of defendants in the *Crookston* case were deliberate, egregious, and malicious. The Supreme Court of Utah, in reference to the trial court judge's order upholding the award, said the order demon-

strates that the "fraud was calculated, willful, and particularly damaging to the Crookstons," and noted:

> First, there is a constellation of circumstances that the court cited in support of the view that Fire Insurance's actions were particularly heinous and deserving of punishment. These include the following: (i) the fraud practiced upon the Crookstons by Fire Insurance was of the most blatant sort, was done to save the company a relatively paltry sum, and was committed with almost certain knowledge that the Crookstons would be exposed to ruinous bankruptcy; (ii) Fire Insurance personnel were well aware that their actions would deprive the Crookstons of precisely the protection from catastrophic losses that the insurance policy was purchased to protect against; (iii) the supervisors involved found nothing objectionable about the fraudulent conduct of their subordinates and, in fact, praised it as sound business practice; and (iv) the consequences of the fraud on the financial and mental health of the Crookstons were devastating.

*Crookston II*, 860 P.2d at 940.

under both federal and Utah law. The evidence was not so strong or not so lacking in clarity or being convincing on the issue of recklessness and deliberate disregard for the rights of others that reasonable minds could not differ thereupon. The court finds and rules as a matter of law, however, that the evidence was such that no reasonable jury could have found punitive damages for "willful and malicious" conduct which is the alternative ground under Utah law for awarding punitive damages. Accordingly, the court determines that only upon the lesser and less egregious alternative of deliberate indifference could a reasonable jury have awarded any punitive damages, and on that ground the motion of Upjohn for judgment as a matter of law or in the alternative for new trial is denied.

The court now turns to the alternative motion for remittitur.

### B. *Motion for Remittitur*

██ The award of $5.5 million punitive damages as related to the award of $313,593 in compensatory damages, a 17½ to 1 ratio, constitutes an award which is presumptively excessive under Utah law.[29] It is a greater punitive damages award than has ever been reviewed by the Utah Supreme Court.[30] Accordingly, this court scrutinizes the award under the seven factors identified by the Supreme Court of Utah, as well as the additional relevant factors of safety concerns (economic damages versus personal injuries),

and sanctions for comparable misconduct in Utah.

#### 1. *The nature of the wrongdoer's acts*

Utah Foam presented 59 comparative transactions to show that it did not receive Upjohn's lowest *actual* price. Plaintiff's experts testified that in 59 of the 112 purchases Utah Foam made from Upjohn between 1978 and 1985 it paid more than its competitors. The experts had "about 160 or 170 invoices" which reflected "a lower price than what Utah Foam was paying at that period of time" but chose to claim damage for only the 59 comparisons. This was in part due to the fact that "most of the invoices would not have changed the damage calculations" or the economic loss was "not as great as the invoices selected."[31] In contrast, Upjohn demonstrated at trial that it gave Utah Foam the best "net delivered price," or invoice price.[32]

It was apparent from the evidence at trial that there was never a meeting of the minds between Upjohn and Utah Foam over the meaning of "best price" or "price." From conflicting evidence, the jury determined that Utah Foam suffered damages in reliance upon its understanding of "best price" based upon unwarranted adjustments granted to its competitors.

#### 2. *The facts and circumstances surrounding the wrongful acts*

There was no evidence at trial of a course of conduct which was egregious and calculat-

---

**29.** Taking into consideration the reductions of $10,019.89 ordered by the court as to compensatory damages, the ratio is increased to 18 to 1.

**30.** In 1987 a jury in the state Third District Court returned a verdict of $500,000 compensatory damages and $10 million punitive damages in favor of plaintiff Mae Roberts who was injured when a cap on a 2–liter 7–Up bottle whizzed off and struck her eye. The trial judge reduced the total damages (compensatory and punitive) to $375,000. The case was not appealed. In 1993 a Tooele County jury returned a verdict of $154 million compensatory damages and $250 million punitive damages against Getty Oil in a gold mining case, but the trial judge granted judgment notwithstanding the verdict and the Supreme Court of Utah affirmed. *Gold Standard, Inc. v. Getty Oil Co.*, 915 P.2d 1060 (Utah 1996).

**31.** 5 Tr. (Peterson) 67–68.

**32.** Upjohn presented a compelling case based on the net delivered invoice price given to Utah Foam as compared with its competitors. All transactions were thoroughly documented and compared, and Upjohn presented evidence that the adjustments which were given did not constitute price adjustments as such. Defendant's expert, James Kearl, testified from a detailed analysis of all comparative transactions that "Utah Foam has a net advantage on [the 59 comparison] transactions." 7 Tr. (Kearl) 126. However, Upjohn knew that the final cost to the customer was not just the invoice price, but that such would be affected by and lowered by adjustments to price, including credits, discounts, and allowances. 6 Tr. (Forest) 70–71.

ed, as was the situation in *Crookston I.*[33]

The isocyanate market was highly competitive during the time period in question. Even though Upjohn established at trial that it was favoring Utah Foam by providing low net delivered prices on bulk purchases, Utah Foam presented evidence that Upjohn failed to pass along to Utah Foam some of the "benefits" it gave to competitors of Utah Foam. In the 59 comparative transactions presented at trial, adjustments given by Upjohn sometimes were not reflected on invoices and in some cases credits or adjustments were established after the fact. An Upjohn salesperson's overzealous negotiation of favorable freight rates which would affect the actual price for isocyanate sales by Upjohn is reflected in an internal memo to the central Upjohn officer. He wrote: "How much [freight allowance] can we get away with?" The cost of freight in that instance was 1.5 cents per pound but the allowance given was 8.4 cents per pound.[34] Also, Utah Foam presented evidence of transfers by Upjohn as a manufacturer of isocyanate to its distributing "systems house" where lower price sales were made in competition with Utah Foam and other isocyanate distributors.[35]

### 3. *The amount of actual damages*

Based on comparative specific transactions, the jury awarded $313,593 in compensatory damages. As determined in this opinion, the figure is reduced by $10,019.89 to a net compensatory award of $303,573.11.

### 4. *The probability that the wrongdoer might act in the same way in the future*

Upjohn sold its Polymer Division and entire isocyanate operation in 1985 and has not been in the business since then. None of the employees involved in the misrepresentations are now employed by Upjohn. Nothing in the record indicates a probability that Upjohn will engage in such activity or repeat these actions in the future.

### 5. *The relationship of the parties*

Utah Foam and Upjohn had a long term business association which began in 1973. At that time, Utah Foam faced financial ruin because its isocyanate supplier at the time was unable to supply product. Upjohn stepped in and literally saved the company.[36]

Utah Foam became one of Upjohn's largest "system house" purchasers. It was a

---

**33.** Upjohn's actions are clearly far less egregious than the conduct involved in *Crookston*. In *Crookston II*, the Court noted that the "fraud practiced upon the Crookstons by Fire Insurance was of the most blatant sort ..." and that defendant's knew that the Crookstons would be exposed to "ruinous bankruptcy" as a result of its actions. 860 P.2d at 940. Lois Valladolid testified that Upjohn gave considerable attention to Utah Foam:

> Q: And in those conversations with Jim Burt, did you talk about how Upjohn was going to treat Utah Foam and Mr. Wilson?
> A: We didn't talk per say about how you treated him because we always felt we treated him—he was considered a primary customer. And every undertaking that went on in the office, whenever a discussion was made about systems suppliers, Utah Foam, Bruce was always, always mentioned. He was always considered.
> Q: Did you ever have any discussions with Mr. Burt about how you were going to treat Utah Foam in comparison with the other systems houses that he was competing against?
> A: We always had to keep Bruce Wilson of Utah competitive. We always had to do that.

6 Tr. (Valladolid) 206–07.

**34.** 7 Tr. (Valladolid) 11; Exh. 9G and 9K.

**35.** The transfers from Upjohn to one of its own divisions did not constitute "sales" and such transfers at internally established "prices" were not per se illegal or improper. However, Mr. Wilson testified that even as to the CPR systems house of Upjohn, Utah Foam had been assured (because of the "best price" arrangement) that it was "at no disadvantage" in the market. 2 Tr. (Wilson) 42. Mr. Wilson testified that it was unfair that Upjohn was able to price and "sell their materials ... through a distributor cheaper than what I could sell as a manufacturer on a direct basis." 2 Tr. (Wilson) 55.

**36.** Bruce Wilson testified that:

> [Utah Foam] developed a very strong loyalty to Upjohn. And the basic reason for that is that if they had not been able to pick us up the chances are that we would not have survived the '73 to '75 time period with the shortage. And because of the fact they did, and did their best in our opinion to take care of us during that time period, we have had a tremendous loyalty to them.

2 Tr. (Wilson) 67.

contract customer and renewed its contract each year. In 1975 Utah Foam contracted to purchase 50% of its requirements from Upjohn. This increased to 95% by 1985. Although Utah Foam was given oral assurances that it was receiving Upjohn's "best price", nowhere in its contracts did it say that Utah Foam was to receive Upjohn's "best" or "lowest" price.

Utah Foam often communicated to Upjohn that it was suffering competitive pressures and needed some relief, and Upjohn sent representatives to Utah Foam regularly in order to maintain their relationship and assess Utah Foam's needs. On one occasion, the director of the Polymer Division traveled to Utah and lowered Utah Foam's price three cents per pound. Later, an Upjohn salesperson lowered Utah Foam's price two cents per pound.[37] After purchasing two million pounds of isocyanate, as a favored contract purchaser, Utah Foam received retroactively a one cent per pound rebate. Utah Foam received further rebates at higher level purchases.

As a result of a steady supply of isocyanate by Upjohn, Utah Foam was able to experience significant growth in the late 1970s, peaking in 1980 at sales of 6 million pounds.

Utah Foam was the purchaser of isocyanate which Upjohn manufactured and sold, but Upjohn was not a fiduciary to Utah Foam. Utah Foam retained the right to purchase isocyanate from other manufacturers if it so desired and receive credit on the Upjohn contract if the purchases were at a lower price.[38] In fact, Utah Foam entertained other offers.[39] Mr. Wilson recalled that isocyanate sales to Utah Foam's Canadian affiliate, Universal Foam, "could be added to [the Utah Foam–Upjohn] contract," and thus establish a more lucrative volume rebate for Utah Foam.[40]

In essence, both Upjohn and Utah Foam were sophisticated business entities with considerable knowledge about the isocyanate industry, and in many transactions operated on an arms length basis.

### 6. *The effect of the misconduct on the lives of the victim and others*

Utah Foam suffered an annual loss of approximately $40,000 during the eight year period it claimed damages. This represents less than 1–2% of Utah Foam's approximately $2.3 to $4.8 million in annual isocyanate sales. Utah Foam presented evidence that if the aforesaid losses had not occurred it could have positively improved the position of the company. However, Utah Foam was not constrained to file for bankruptcy protection or go out of business during the period or at any time.

### 7. *The relative wealth of the wrongdoer.*

The jury was instructed that at the end of 1994 Upjohn's net worth was $2.3 billion. At trial the jury learned that Utah Foam's net worth was over $1 million and that Upjohn's

---

**37.** Bruce Wilson testified that "Mr. Raymore on his first visit on his own authority lowered our price two cents a pound." 2 Tr. (Wilson) 54.

**38.** The contract allowed Utah Foam "to purchase product of equal quality and like quantity and on similar terms from others at a lower price than is in effect hereunder" to which Upjohn had the option of "either supply[ing] such shipment at lower price or permit[ting Utah Foam] ... to purchase such quantity elsewhere and the quantity so purchased elsewhere will be deducted from the total quantity of this contract." 2 Tr. (Wilson) 75.

**39.** Mr. Stephen Forest, an Upjohn salesperson, read the following sales report into evidence:

Bruce says thank you for the one cent rebate. Bruce feels that his price might be a little high. . . . Bruce says he will buy a truckload from Rubicon because he owes Lee a favor. Business is very good for the contracting firm and pretty good for the systems business. Bruce didn't have anything to complain about this time.

5 Tr. (Forest) 145–146. Another sales report read:

Rubicon came in and told Bruce that the price per bulk was 66 cents per pound 30 days. I adjusted Utah Foam's price to 67 cents per pound, less one cent for volume, (two million pounds). Bruce would not give me the price, but I believe BASF is selling drums to Universal at approximately 75 cents per pound, any quantity, because BASF is warehousing for Universal Foam in Calgary.

5 Tr. (Forest) 146.

**40.** 2 Tr. (Wilson) 82.

isocyanate division was sold in 1985 for $232 million.

Counsel for Utah Foam spent a considerable portion of his argument addressing the jury regarding Upjohn's wealth in competition with punitive damages, asserting that Upjohn could easily absorb any compensatory damage award as a cost of doing business and that a "company of such size would feel no punishment or pain in paying a punitive award of 5.5 million." [41]

Plaintiff places particular emphasis upon the factor of wealth in justification of the punitive damages award. In emphasizing Upjohn's wealth and its ability as a large international corporation to pay such an award, plaintiff cites *Behrens v. Raleigh Hills Hospital*, 675 P.2d 1179, 1187 (Utah 1983). In that case, the Supreme Court of Utah stated that punitive damages may "be appropriate to take the profit out of wrongdoing where compensatory damages are small in relation to the financial resources of a defendant and can be subsumed as a cost of doing business." However, absent from the decision is any discussion of factors which would support imposition of large punitive damage awards. [42]

Plaintiff relies upon several cases where large punitive damage awards have been upheld against wealthy defendants. In *Capstick v. Allstate Ins. Co.*, 998 F.2d 810 (10th Cir.1993), a $2 million punitive damages award (with $4,500 compensatory damages, a 444 to 1 ratio) was upheld. The court reasoned that in order to meet the purpose of the Oklahoma law which was "to punish and deter the wrongdoer," the damage "award must be sufficient to attract the attention of the defendant in order to assure that oppressive practices do not continue." *Id.* at 823. [43] In *Eichenseer v. Reserve Life Ins. Co.*, 934 F.2d 1377 (1991), the Fifth Circuit justified a large award with a high ratio (500 to 1 ratio) because the defendant's conduct "was particularly egregious" (since it) "acted with reckless disregard—if not intentional disregard—for the rights of its insured." Such conduct was a "significant factor" which supported the award. [44] In *Glasscock v. Armstrong Cork Co.*, 946 F.2d 1085 (5th Cir.), *cert. denied*, 503 U.S. 1011, 112 S.Ct. 1778, 118 L.Ed.2d 435 (1991) the court acknowledged that the $6.1 million punitive damages award in this multiple-plaintiff asbestos injury case was high, but upheld the award because it did not violate Texas' rule that punitive damages awards be reasonably proportioned to

---

**41.** Plaintiff's Memorandum in Opposition, p. 16.

**42.** The court addressed whether punitive damages may be awarded in a wrongful death action and cautioned that punitive damages should be awarded infrequently, and "only when they will clearly accomplish a public objective not accomplished by the award of compensatory damages." The Court further stated that the "intended deterrent effect must be clear and in proportion to the nature of the wrong and the possibility of recurrence." *Behrens*, 675 P.2d at 1187.

**43.** In *Capstick*, plaintiff filed his claim with its automobile insurer after an accidental fire completely destroyed his car. However, defendant denied coverage and informed plaintiff that the "fire appears to be of incendiary origin for which you are responsible." 998 F.2d at 812. Nearly from the beginning, defendant believed that plaintiff had set his car on fire; witnesses and other evidence in support of plaintiff's story were ignored. The court determined that the evidence indicated that

> Allstate's conduct was *particularly egregious and wrongheaded, clearly oppressive and "evidencing a wanton or reckless disregard"* for Capstick, its insured. It is significant that Allstate specifically and repeatedly labeled Cap-

stick as an arsonist and one who intended to pursue an insurance fraud. These are significant factors which support the punitive award in this case.

*Id.* at 821 (emphasis added). What was of particular concern to the court was that the defendant's employees, including high ranking officials, testified that they would continue to handle future claims of this type in the same manner. *Id.* at 823.

**44.** Plaintiff submitted a claim of $6,658.35 under her major medical policy for a hysterectomy, yet *defendant denied her claim without reviewing any medical records to support its decision*, merely stating that the acute pelvic inflammatory disease that she had was a preexisting illness which the policy did not cover. Defendant *continued to deny coverage* despite plaintiff's efforts to enlighten the defendant, including the submission of medical records and her doctor's affidavit. During pretrial discovery, some three years later, defendant paid plaintiff's claim. Still, plaintiff pursued the action for extracontractual damages and punitive damages. After a bench trial, the district court judge awarded plaintiff $1,000 in compensatory damages and $500,000 in punitive damages. 934 F.2d at 1379–80.

actual damages.[45]

Plaintiff cites *Spaeth v. Union Oil Co. Of California*, 762 F.2d 865 (10th Cir.1985) as an example where the defendant's wealth justifies a large award. But the court merely stated that the "wealth of the defendant and the risk created by the defendant's conduct are substantial factors to be considered in calculating punitive damages." *Id.* at 866.[46] Plaintiff also cites to *Harrell v. Old American Ins. Co.*, 829 P.2d 75 (Okl.Ct.App. 1991), where a 6 to 1 ratio was upheld ($250,000 punitives to $41,800 compensatory damages). However, Old American's wealth was just one factor among many which the court considered.

Manifestly, wealth alone does not justify imposition of a disproportionately large punitive damage award. Indeed, retired Supreme Court Justice White sitting by designation on the Eighth Circuit observed that while "a defendant's wealth may be taken into account in order to ensure that an award will adequately deter any future such conduct, a defendant's wealth cannot alone justify a large punitive damages award." *Pulla v. Amoco Oil Co.*, 72 F.3d 648, 659 n. 16 (8th Cir.1995) (*citing TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 462–64, 113 S.Ct. 2711, 2723, 125 L.Ed.2d 366 (1993).[47]

This court concludes that none of the relevant seven factors repeatedly listed by the Utah court, except a bald comparison of relative wealth, clearly weighs in favor of Utah Foam.

## 8. Safety Concerns: Economic Damages Verses Personal Injuries

An additional factor of relevance in scrutinizing a punitive damages award is the na-

ture of the injuries suffered. In this regard, in *BMW*, the Supreme Court noted that the "harm BMW inflicted on Dr. Gore was purely economic in nature," and that BMW's actions did not affect the car's safety or performance and "evinced no indifference to or reckless disregard for the health and safety of others." —— U.S. at ——, 116 S.Ct. at 1599. The Court said:

> To be sure, infliction of economic injury, especially when done intentionally through affirmative acts of misconduct, or when the target is financially vulnerable, can warrant a substantial penalty. But this observation does not convert all acts that cause economic harm into torts that are sufficiently reprehensible to justify a significant sanction in addition to compensatory damages.

*Id.*

Although Upjohn was aware of Utah Foam's competitive pressures, its actions did not have any safety implications. The damages suffered by Utah Foam were wholly economic.

## 9. Sanctions for Comparable Conduct in Utah

Another important factor to be taken into consideration in the scrutiny analysis, as discussed by the Supreme Court in *BMW*, is a comparison of "the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct." *BMW*, —— U.S. at ——, 116 S.Ct. at 1603.

In Utah, monetary sanctions which might be imposed for arguably comparable misconduct include penalties set forth in the Pattern

---

**45.** Based on compensatory damages of $317,000, the ratio is 19 to 1. In Texas the proportionality requirement does not set forth a specific ratio. After considering five factors under Texas law, the court determined that the award was not excessive and was reasonably proportioned to actual damages. 946 F.2d at 1095–96.

**46.** Even though the defendant's conduct in *Spaeth* was *egregious* and it had *maliciously* allowed drainage off plaintiff's gas and opposed her efforts for relief, the jury's award was re-

duced from $3 million to $2 million. 762 F.2d at 867.

**47.** Thaddeus Pulla sued his employer, Amoco, for allegedly examining his credit card records in order to determine whether he was abusing his sick leave. On an invasion of privacy claim, the jury awarded plaintiff two dollars in actual damages, one for past pain and suffering and one for future pain and suffering. The jury returned a verdict of $500,000 in punitive damages. 72 F.2d at 653.

of Unlawful Activity Act,[48] the Unfair Practices Act,[49] and the Antitrust Act.[50] None of the sanctions which could be imposed in these assumed comparables approach the $5.5 million punitive damages award in this case. To the contrary, under the circumstances of this case, the comparisons demonstrate that the $5.5 million punitive damage award is excessive and far out of step with even maximum monetary sanctions.

On review of the evidence at trial, this court considers that the punitive damages award in this case could neither withstand constitutional scrutiny under *BMW,* nor the "reasonable and rational" scrutiny required under Utah law. This court determines that no exceptional circumstances were presented to justify the grossly excessive punitive damages award in this case. The relationship between compensatory and punitive damages was not reasonable and rational. In this regard, the ratio between the amount of actual damages awarded and the amount awarded as punitive damages is grossly excessive. Furthermore, the punitive damages award does not appropriately reflect the level of Upjohn's misconduct. Decidedly, no egregious conduct was presented which would justify the amount of the award based upon clear and convincing evidence.

Based upon the foregoing, this court grants a remittitur to a ratio of 2 to 1. In accordance with the revised compensatory damages award reflected in this opinion, the punitive damages award is reduced to $607,146.22.

## IV. POST JUDGMENT INTEREST RATE

■ With respect to the judgment rate applicable to post judgment interest, 28 U.S.C. § 1961(a) provides:

Interest shall be allowed on any money judgment in a civil case recovered in a district court.... Such interest shall be calculated from the date of the entry of judgment, ...

Post-judgment interest begins to accrue on a judgment on the date the fees were "meaningfully ascertained and included in a final appealable judgment." *MidAmerica Federal Savings & Loan Assoc. v. Shearson/American Express, Inc.,* 962 F.2d 1470, 1475 (10th Cir.1992). Plaintiff claims that the post judgment interest rate should be determined under Utah law. However, under *Everaard v. Hartford Acc. & Indem. Co.,* 842 F.2d 1186, 1193 (10th Cir.1988), federal law governs the post-judgment interest rate, even in diversity cases. The rate of interest on March 1, 1996, and March 4, 1996 when the verdicts were returned on compensatory and punitive damages, respectively, was 5.25% per annum. Accordingly, interest should accrue on the awarded amounts on and after those dates.

Based upon the foregoing, it is hereby

ORDERED, that defendant's motion for judgment as a matter of law or for new trial, as to both compensatory damages and punitive damages, is Denied; it is

FURTHER ORDERED, that the compensatory damages award in favor of plaintiff is reduced to $303,573.11; it is

FURTHER ORDERED, that defendant's Objection to an award of prejudgment interest on the verdict for compensatory damages in favor of plaintiff is Granted; it is

FURTHER ORDERED, that defendant's motion for remittitur as to the punitive damages award is Granted and the award is reduced to $607,142.22; it is

FURTHER ORDERED, that post judgment interest shall accrue at the rate of

**48.** Under the Pattern of Unlawful Activity Act an injured person may recover twice the damages he sustains, plus reasonable attorneys fees. If a crime is involved the maximum fine which could be imposed by state action under the statute is $10,000 for each offense. U.C.A. §§ 76–10–1603.5(1), 76–10–1605(1) and 76–3–301.

**49.** Treble damages or $2,000, whichever is greater, may be imposed as damages for using "unfair methods of competition in commerce or trade"

in violation of the Unfair Practices Act. U.C.A. § 13–5–14.

**50.** Under the Antitrust Act a private person could be awarded three times the amount of the damages sustained, plus attorneys fees. In addition, in a proper case fines could be imposed by the state. U.C.A. §§ 76–10–919(1) and 76–10–920(1) (1979).

5.25% per annum, from and after March 1, 1996, on the adjusted compensatory damages award of $303,573.11; it is

FURTHER ORDERED that post judgment interest shall accrue at the rate of 5.25% per annum, from and after March 4, 1996 on the adjusted and reduced punitive damages award of $607,142.22.

Counsel for defendant is directed to prepare and lodge with the court a form of judgment consistent with this Memorandum Decision and Order after first complying with local Rule 206(b).

IT IS SO ORDERED.